STATE OF CONNECTICUT *v.* JOHN C. MARTIN
(10516)

PETERS, C. J., HEALEY, PARSKEY, DANNEHY and SANTANIELLO, Js.

Argued October 10, 1984—decision released February 5, 1985

*Maxwell Heiman,* with whom were *Edward J. McMahon* and, on the brief, *William J. Tracy, Jr.,* for the appellant (defendant).

*David S. Shepack,* deputy assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *Carl Schuman,* assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant was charged with the crime of murder in violation of General Statutes § 53a-54a (a) and found guilty after trial to a three judge panel. On this appeal, the defendant claims that the court erred in denying the defendant's motion for acquittal because the state failed to prove beyond a reasonable doubt that the defendant possessed the specific intent to commit murder.[1]

The trial court could reasonably have found the following facts: The defendant lived alone in an apartment at 27 Burgundy Hills in Middletown and was considered to be a "quiet and strange" individual. He was very impatient and nervous around groups of people, and if they gathered in his apartment to socialize, he would often suddenly ask them to leave. On August 24, 1979, between the hours of 5 p.m. and 9:30 p.m., approximately ten different people were at the defendant's apartment at various times. They congregated inside the apartment and on the back porch, talked, and smoked some marihuana. The defendant remained inside the apartment most of the evening, and drank one vodka and lemonade and a couple of glasses of wine. There is no evidence that he smoked any marihuana at this time.

At approximately 9:30 p.m., the defendant requested that everyone present leave his apartment. Three of the guests left, and a few minutes later three other people arrived and joined the defendant and the two remaining guests, Joe Gudreau and Elizabeth DeFinis. The five guests stood outside on the back porch for about five minutes and then moved into the living room

---

[1] The defendant originally briefed two issues, the first of which questioned the validity of the defendant's waiver of his right to a jury trial. That issue was withdrawn on the defendant's motion. Additional claims of error that the defendant raised preliminarily on this appeal have not been briefed, and are therefore considered abandoned. *Kiniry* v. *Danbury Hospital*, 183 Conn. 448, 449, 439 A.2d 408 (1981).

and began playing cards. At approximately 9:50 p.m., the defendant again asked everyone to leave, saying "You guys got to go now. I want to go to bed." The card game continued, with one guest saying, "Let me finish this hand and we'll leave." The defendant sat and waited a few moments and then went into his bedroom where he removed his vest and put on a blue denim jacket. When he returned to the living room he drew a gun and fired a single shot, killing the victim, Elizabeth DeFinis.

There was testimony from several witnesses that immediately after the shot the defendant was seen standing up with a gun in his hand, "holding it right out pretty straight" with his arms extended from his sides. The gun was pointed "right at" the victim, who was about eight or ten feet away, and was held so that the defendant could see through its sights. None of the witnesses testified to seeing the defendant aiming or pointing the gun at the victim prior to the shot.

After the shot the defendant ordered the guests to "leave now." As the defendant attempted to put the gun into his pants, he was attacked by several of the guests, and during the melee, dropped the gun, which was then thrown off the porch by one of the guests. The defendant was kicked down the stairs and he ran off toward the woods. When the police arrived they found the apartment in disarray and observed the victim lying on her back on the floor of the room. They located the murder weapon in a sandbox a short distance from the back porch of the defendant's apartment. It was a .380 caliber semiautomatic pistol that required a heavy trigger pull to cause it to fire.

A search of the defendant's apartment produced eight other firearms, including a .22 caliber pistol found in a drawer in the living room, a twelve gauge shotgun, a .22 caliber rifle, and a .30-30 caliber rifle found

in a gun rack on a wall in the bedroom. Additionally, another twelve gauge shotgun was found on the defendant's bedroom floor, and a number of other weapons were found in a bedroom foot locker. On top of the dresser were two live .380 caliber shells and on top of the footlocker a box of .380 caliber ammunition. There was evidence that the defendant was knowledgeable about guns and had previously been observed wearing a jacket to conceal a weapon in the belt loop of his trousers.

While a police officer guarded the gun that was lying in the sandbox, an individual matching the defendant's description came toward him. The individual identified himself as the defendant and stated that he had been beaten and robbed by two men. He was taken into custody, and at the police station appeared dull and unemotional, showing no concern for the victim's welfare.

During the trial, Mehadin K. Arafeh, a psychiatrist called by the state, testified that the defendant was capable of forming the intent to kill and that the defendant's mental state on the date of the crime would not have prevented him from taking consecutive steps to execute an aggressive act. Walter A. Borden, a psychiatrist called by the defendant, although noting that his testimony was "an inferred, somewhat speculative opinion as to what happened," indicated that he believed that the defendant had not formulated the intent to kill. On cross-examination he conceded that positive testimony showing that the defendant had aimed the gun would have led him to conclude that he possessed the intent to kill.

On this appeal the defendant contends that the state failed to meet its burden of proving beyond a reasonable doubt a specific element of the crime of murder, namely that of intent to cause the death of another person, and that therefore the trial court erred in deny-

ing the defendant's motion for acquittal. General Statutes § 53a–54a (a) provides that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." Section 53a-3 (11) states: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct."

"Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981); see *State* v. *Stankowski,* 184 Conn. 121, 127, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977); *State* v. *Bzdyra,* 165 Conn. 400, 404–405, 334 A.2d 917 (1973); *State* v. *Litman,* 106 Conn. 345, 352–53, 138 A. 132 (1927). The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. *State* v. *Rodriguez,* 180 Conn. 382, 404, 429 A.2d 919 (1980).

The intent of an actor is a question for the trier of fact, and the conclusion drawn by the trier in this regard will stand unless this court determines it to be unreasonable. *State* v. *Holley,* supra, 26. Our inquiry is therefore limited to whether the facts, supporting reasonable inferences, allowed the trier of fact to find the defendant guilty beyond a reasonable doubt of the crime of which he was convicted. *State* v. *Haddad,* 189 Conn. 383, 387, 456 A.2d 316 (1983).

The circumstantial evidence in this case is largely uncontested, but the parties differ as to the reasonable inferences that can be drawn from it. The defendant relies upon the fact that no witness saw him point the gun prior to the shot to support his argument that the state failed to prove beyond a reasonable doubt that he possessed the specific intent to kill the victim. The defendant further cites the testimony of Borden, who described the defendant as in a borderline state, possessing qualities of impulsivity, poor judgment, and a strong tendency to act out problems rather than think or feel them, and relies on Borden's conclusion that the act of shooting the victim was not organized or thought through, but was performed out of anger.

The state counters by noting that, although no one saw the defendant aim the gun prior to the shot, the evidence revealed that immediately after the shot the defendant was viewed standing up straight with his arms extended from his sides and pointing the gun right at the victim, with the gun held out so the defendant could aim through the gun sights. The state contends that from this testimony the trial court reasonably could have concluded that the defendant aimed at the victim.

It is within the province of the trier of fact to draw reasonable and logical inferences from the facts proved. *State* v. *Williams,* 169 Conn. 322, 336, 363 A.2d 72 (1975). This court will construe the evidence in the light most favorable to sustaining the trial court's verdict and will affirm the conclusion of the trier if it is reasonably supported by the evidence, with logical inferences drawn therefrom. *State* v. *Perez,* 183 Conn. 225, 227, 439 A.2d 305 (1981). We find, after a careful review of all the evidence presented in this case, that the trial court could reasonably have concluded that the defendant possessed the specific intent to kill Elizabeth DeFinis.

Witnesses testified that the defendant entered his bedroom just prior to the shooting, and emerged with his clothing changed from a vest to a blue denim jacket. It was further shown that, in the past, the defendant had sometimes worn a jacket in order to conceal a gun. The evidence also revealed that shortly after he emerged from his bedroom he possessed a .380 caliber gun, which he used to shoot and kill the victim. Following the shooting several live .380 cartridges were found on the defendant's dresser, and a box of the same ammunition was found on top of a footlocker. From all of the above evidence the trial court could reasonably have concluded that the defendant entered his bedroom, loaded a .380 caliber gun with live cartridges and then placed the weapon under his jacket to hide it from the view of the guests. Although lack of evidence existed as to the defendant's aim of the gun in the seconds before the shooting, the trial court could properly have found from the testimony of witnesses that immediately following the shooting the defendant was standing with the gun held straight out in front of himself such that he could clearly see through its sights and was pointing the gun right at the victim and that he had aimed at the victim with the intention of shooting her. The fact that the gun required a heavy trigger pull to cause it to fire, considered with all the other evidence, negates the claim that the shooting was accidental.

Although psychiatrists for the state and the defendant gave somewhat conflicting testimony, the conclusions of both experts support the trial court's findings. The state's witness, Arafeh, stated that, in his opinion, the defendant possessed the intent to kill. The defendant's expert, Borden, stated that he did not believe the defendant had the intent to kill, but conceded that if positive evidence showed that the defendant aimed the gun prior to the shooting, he would also

have concluded that the defendant possessed the intent to kill. Since the trial court could properly infer that the defendant aimed the gun prior to the shot, it could also conclude from both psychiatrists' testimony that the defendant intended to kill the victim. Similarly, the fact that the defendant showed no concern for the welfare of the victim, either following the shooting or later at the police station, also buttresses the trial court's conclusion. *State* v. *D'Antuono,* 186 Conn. 414, 425, 441 A.2d 846 (1982).

The defendant argues that an inference of intent must be based on evidence that supports only one hypothesis of guilt and suggests that, in determining the mental state of this accused at the time of the shooting, the trial court was faced with a wide range of possible explanations. If in fact there was a basis in the evidence to infer some state of mind other than intent to kill, the defendant would be correct. Insofar as no such evidence existed and there was no reasonable hypothesis of innocence which the state was required to disprove, the defendant's claim is without merit. It is critical that " '[p]roof of guilt must exclude every reasonable supposition of innocence. . . . "[A] mere 'possible hypothesis' of innocence will not suffice." ' (Citations omitted.) *State* v. *Englehart,* 158 Conn. 117, 121–22, 256 A.2d 231 (1969)." *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984). " ' "[T]he issue is whether the . . . [trial court] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to jusify the verdict of guilty beyond a reasonable doubt." ' " *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980); *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979). Viewed in a light most favorable to sustaining the verdict, the cumulative effect of the evidence amply sup-

ports the trial court's finding that the defendant acted with the intent to cause the death of Elizabeth DeFinis.

There is no error.

In this opinion the other judges concurred.