STATE OF NEBRASKA, APPELLEE, V. LARRY A. ROKUS, APPELLANT.
483 N.W.2d 149

Filed May 1, 1992.   No. S-90-1198.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

A jury in the district court for Douglas County convicted Larry A. Rokus of the second degree murder of Joseph A. Kashuba, which is a violation of Neb. Rev. Stat. § 28-304(1) (Reissue 1989): "A person commits murder in the second degree if he [or she] causes the death of a person intentionally, but without premeditation."

Rokus' sole assignment of error is that the evidence is insufficient to sustain a finding that he intentionally killed Kashuba.

## BACKGROUND FOR THE FATALITY

Late in the evening of February 1, 1990, Rokus and Kashuba, both adults, visited a friend's residence where they and two others drank beer and were listening to music when the subject of conversation turned to one of the party's interest in purchasing a firearm for self-protection. Rokus left and returned with his .44-caliber Magnum double-action revolver, a

shoulder holster, and a supply of hollow-point bullets for the revolver. A hollow-point bullet flattens on contact with living tissue and produces great internal damage.

The .44 Magnum can be fired in two different modes, single action and double action. In the single-action mode, the revolver's hammer is pulled back by hand until a spring mechanism locks the hammer in its cocked position. The hammer is released by pulling the revolver's trigger, allowing the hammer to move forward and drive the firing pin against the primer of a cartridge in the revolving cylinder. Firing the revolver in its double-action mode is accomplished by pulling the revolver's trigger, which compresses the mainspring as the hammer moves backward; however, as the hammer reaches its most rearward position, it is not locked in the cocked position, but immediately starts forward to strike the revolver's firing pin. In normal operation, firing the revolver in its single-action mode requires $4^1/2$ pounds of pressure on the trigger, while $11^3/4$ pounds of pressure must be applied on the trigger to fire the revolver in its double-action mode.

Rokus, after ascertaining that the revolver was unloaded, passed the revolver among Kashuba and the others for their inspection. Sometime later, the others left Rokus and Kashuba in the dining room of the residence. At approximately 5 a.m. on February 2, Rokus appeared at the residence of John and Paula Hansen, who lived approximately four blocks from the house where Rokus had been showing the .44 Magnum to Kashuba, and pounded on Hansens' front door while he was screaming: "I need help. I have shot someone. I have killed them. God forgive me." When Rokus persisted in pounding on the door, John Hansen called 911 for police assistance.

Responding to Hansen's call, Omaha police officers Wayne Melcher and Shane Farrow arrived at Hansens' and found Rokus, who ran up to the police cruiser and exclaimed: "Oh, My God, I just shot my friend. My God, you have to help me. He is dying." Rokus then handed Melcher a registration slip for the .44 Magnum, gave the officer two bullets for the revolver, and told the officer that he had thrown the revolver into a storm sewer.

Although Rokus was unable to supply the address where the

shooting had occurred, he did give police a telephone number through which the officers obtained the address. Officers Melcher and Farrow, with Rokus, proceeded to the site of the shooting and, on arrival at the scene, found Kashuba's lifeless body on the dining room floor. Melcher used the telephone at the residence to summon investigators from the homicide unit of the Omaha Police Division.

Several members of the police division arrived to conduct an investigation into the shooting. Kashuba's body was lying on the floor near a dining room wall in which there was a bullet hole and an embedded "slug" approximately 38 inches from the floor's surface. A chair was tipped over near the body. A wound was located near the base of Kashuba's skull. Those circumstances led police to conclude that Kashuba was sitting in a chair near the wall when the bullet struck the base of Kashuba's skull, passed through his head, and then entered the wall near the chair. Melcher directed that Rokus be taken to police headquarters. Kashuba's body was removed for an autopsy while the police investigation continued, leading officers to the .44 Magnum found on the ground near an abandoned garage about three blocks from the scene of the fatality.

While Officer Victoria Mailander was transporting Rokus in a police cruiser to headquarters, Rokus, without any inquiry from Mailander, stated that he hoped "everyone is okay" and that the shooting was "an accident." Rokus continued to talk to Mailander and told her that "he brought [the .44 Magnum] over [to Kashuba] and when he handed it to him he [Rokus] forgot it was loaded and it went off."

## INTERROGATION OF ROKUS

Around 8:30 a.m. at police headquarters, Officer James Wilson read a "Rights Advisory Form," that is, the *Miranda* warning and admonition, to Rokus and commenced questioning him. In the course of this interrogation, Rokus said that he had wanted to show Kashuba how to load the .44 Magnum; therefore, he placed six hollow-point bullets in the revolver's cylinder and handed the loaded revolver to Kashuba. As Rokus described the situation, after Kashuba had examined

the loaded revolver, he began "handing it back to [Rokus], butt first, the barrel towards Mr. Kashuba, and the gun . . . discharged." In response to Rokus' description of the shooting, Wilson said that in view of the fact that the Magnum was a "wheel gun or a cylinder type revolver," Wilson "had problems with that story." At that point, Rokus acknowledged that he "had lied" and that the shooting actually occurred as Rokus was demonstrating a quick draw from the shoulder holster, which he was wearing, and when Rokus "quick drawed," the revolver discharged the bullet that struck Kashuba. After additional questioning, the interrogation ended.

Somewhat contemporaneous with the interrogation of Rokus, Dr. Blaine Roffman completed an autopsy on Kashuba and concluded that Kashuba had sustained "a contact gunshot wound in the back of the head, which exited on the top of the head causing massive skull fractures and brain destruction." When the police learned about Dr. Roffman's conclusions concerning Kashuba's wounds, Officer Wilson, with Officer Robert Sklenar, decided to resume questioning Rokus, who, again, was supplied with the *Miranda* warning or admonition. Wilson informed Rokus concerning Kashuba's wounds and told Rokus that the account of the shooting related by Rokus in the earlier interrogation was "not matching up" with the results of the autopsy. Rokus responded that Kashuba was killed while the pair was "playing Russian roulette." Wilson asked how anyone could play Russian roulette with six bullets in the cylinder chambers of the fatal revolver, and Rokus answered that he and Kashuba "were simply pointing the gun at each other's heads and not pulling the trigger." Rokus then told the officers that while engaged in Russian roulette, he pointed the .44 Magnum at Kashuba, and the gun discharged. Rokus maintained that he did not intend to pull the trigger and that the shooting was an accident. Later in the course of this second interrogation, Rokus gave still another version of the shooting: Rokus, while Kashuba had his head turned away from Rokus, "took the gun out of the holster, placed it to the back of [Kashuba's] head," and said, "Surprise, mother fucker," as Rokus pulled the trigger.

## ROKUS' TRIAL

In Rokus' trial, Dr. Roffman testified that his main findings in the autopsy pertained to Kashuba's head,

> where the first thing noted was a large eleven by four centimeter area of skull bones protruding and lacerations of brain substance through the left parietal area of the skull, small bullet fragments were present throughout the skull, and the posterior occipital area of the skull, approximately seven centimeters above the nape of the neck, was a contact gunshot wound of the skin . . . a contact gunshot wound in the back of the head approximately three inches above the nape of the neck on top of the head, just slightly to the left. There was massive destruction of bone and brain being blown out. So there was a huge gaping defect. The defect would measure two by five inches. When a probe was passed from the entrance gunshot wound through the exit wound, the probe passed and showed the course was perpendicular and direct from the entrance wound to the exit wound.

Further, in explaining the characteristics of a contact wound, Dr. Roffman testified:

> Entrance gunshot wounds, particularly when they occur over a hard surface, namely the head, when the skull is underlying it with very thick bone and the gun is pressed up tightly against that area, when the gun is exploded the gases go into that wound and back flow and produce a back flash of powder and gases and blow out that entrance wound. Instead of being a nice, round, delineated entrance wound, it produced what's known as a star-shaped pattern because the gases that blow back, plus the bone, because of all these gases that come from the gun, it produces a star-shaped pattern and the skin is split in several areas and blows back and produces a contact gunshot wound in the head area.

Dr. Roffman concluded that Kashuba "[d]ied of a contact gunshot wound in the back of the head, which exited on the top of the head causing massive skull fractures and brain destruction."

A firearms expert testified for the State regarding his

conclusions reached after examining and testing Rokus' .44 Magnum revolver. According to the firearms expert, the revolver was not defective and would not fire accidentally, since there was a fully operational safety device to prevent accidental discharge of the revolver. When asked if the revolver could be accidentally discharged, the expert answered, "Not under any circumstance that I could think of, unless a hard blow was dealt to the hammer to somehow overcome" the revolver's safety.

In his testimony, Rokus related that after Kashuba was shot, Rokus ran out of the house and down the street instead of using the telephone at the residence where the shooting had occurred. As Rokus ran from the scene of the shooting, he unloaded the revolver and later threw the bullets and gun away. Notwithstanding the different accounts given during his interrogation, Rokus testified that he had approached from behind Kashuba, who was sitting in a chair, pulled the .44 Magnum from its shoulder holster on Rokus, and then put the revolver to Kashuba's head, "just joking around," and said, "Surprise," as the gun discharged. Rokus had believed that the revolver was "unloaded" when he put the firearm to Kashuba's head and could not recall whether the revolver had been cocked.

## STANDARD OF REVIEW

In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Fleck*, 238 Neb. 446, 447, 471 N.W.2d 132, 134 (1991). Accord, *State v. Schumacher, ante* p. 184, 480 N.W.2d 716 (1992); *State v. Witt*, 239 Neb. 400, 476 N.W.2d 556 (1991); *State v. Tuttle*, 238 Neb. 827, 472 N.W.2d 712 (1991); *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990).

On a claim of insufficiency of evidence, an appellate court will not set aside a guilty verdict in a criminal case

> where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.

*State v. Fleck*, 238 Neb. at 447, 471 N.W.2d at 134. Accord, *State v. Schumacher, supra*; *State v. Witt, supra*; *State v. Tuttle, supra*; *State v. Zitterkopf, supra*; *State v. Robertson*, 223 Neb. 825, 394 N.W.2d 635 (1986).

## PROOF OF INTENT TO KILL

The focal point in Rokus' appeal is his contention that he did not intentionally cause Kashuba's death.

" 'Circumstantial evidence' means facts or circumstances, proved or known, from which existence or nonexistence of another fact may be logically inferred or deduced through a rational process." *State v. Jasper*, 237 Neb. 754, 763, 467 N.W.2d 855, 862 (1991). See, also, *State v. Witt, supra*; *State v. Fleck, supra*. "A defendant may be convicted by circumstantial evidence which establishes the defendant's guilt beyond a reasonable doubt. The State is required to establish the defendant's guilt for the crime charged, but is not required to disprove every hypothesis consistent with the defendant's presumed innocence." *State v. Blue Bird*, 232 Neb. 336, 339, 440 N.W.2d 474, 476 (1989). Accord, *State v. Witt, supra*; *State v. Fleck, supra*.

"Intent is the state of the actor's mind when the actor's conduct occurs." *State v. Pierce*, 231 Neb. 966, 971, 439 N.W.2d 435, 440 (1989). Accord *State v. Craig*, 219 Neb. 70, 361 N.W.2d 206 (1985). "*Intentionally* means willfully or purposely, and not accidentally or involuntarily." *State v. Schott*, 222 Neb. 456, 462, 384 N.W.2d 620, 624 (1986). Accord, *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989); *State v. Pierce, supra*. "The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding an incident." *State v. Pierce*, 231 Neb. at 971, 439 N.W.2d at 440. Accord, *State v. Witt, supra*; *State v. Tuttle, supra*; *State v. Swigart*, 233 Neb. 517, 446 N.W.2d 216 (1989). "When an element of a crime involves

existence of a defendant's mental process or other state of mind of an accused, such elements involve a question of fact and may be proved by circumstantial evidence." *State v. Hoffman*, 227 Neb. 131, 140, 416 N.W.2d 231, 237 (1987). Accord *State v. Witt, supra.*

From circumstances around a defendant's voluntary and willful act, a jury may infer that the defendant intended a reasonably probable result of his or her act. See, *People v. Bartall*, 98 Ill. 2d 294, 456 N.E.2d 59 (1983); *People v Getch*, 50 N.Y.2d 456, 407 N.E.2d 425, 429 N.Y.S.2d 579 (1980). Consequently, the court in *United States v. Kimmel*, 777 F.2d 290, 292 (5th Cir. 1985), approved the following instruction:

> "As a general rule it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing his knowledge should reasonably have expected to result from any act of conscious omission and any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant did possess the required intent."

Cf., *State v. Jasper, supra* (constitutionally prohibited instruction that requires an inference adverse to a criminal defendant); *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) (constitutionally prohibited use of a mandatory presumption that a criminal defendant intended probable consequences of the defendant's acts).

Circumstances surrounding the fatal shot from Rokus' revolver allow and support the inference that Rokus intended to shoot and kill Kashuba. The jury was entitled to find that Kashuba was seated in a dining room chair while Rokus was approaching from behind Kashuba. From the location of the contact wound on Kashuba's head, the jury could infer that the fatal hollow-point bullet was fired at point-blank range from the .44 Magnum's muzzle at the base of Kashuba's skull; hence, Rokus was deliberately pointing the revolver at Kashuba when the weapon discharged. None can argue that a hollow-point

bullet fired from a .44 Magnum is not a life-threatening projectile. Intent to kill may be inferred from deliberate use of·a deadly weapon in a manner reasonably likely to cause death. See, *Furr v. State*, 308 Ark. 41, 822 S.W.2d 380 (1992) (homicidal intent may be inferred from the type of weapon used, the manner of its use, and the nature and location of the wounds); *Rhinehardt v. State*, 477 N.E.2d 89 (Ind. 1985) (intent to kill may be inferred from use of a deadly weapon in a manner reasonably likely to cause death); *State v. Noble*, 425 So. 2d 734 (La. 1983) (defendant's shooting the victim in the head at close range may be a basis for the jury's inference that the defendant intended the victim's death); *Raspberry v. State*, 275 Ind. 504, 417 N.E.2d 913 (1981) (intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death); *State v. Price*, 365 N.W.2d 632 (Iowa App. 1985) (intent to kill may be inferred from the use of a deadly weapon); *People v. Evans*, 92 Ill. App. 3d 874, 416 N.E.2d 377 (1981) (intent to kill may be inferred from a defendant's use of a deadly weapon to harm the victim). The .44 Magnum was equipped with a fully operational safety, had no defects, and required substantial pressure on the trigger for firing, especially if the revolver was in its double-action mode, namely, 11³/₄ pounds of pressure had to be applied to the trigger to discharge the revolver. A firearm equipped with an operational safety device and requiring heavy trigger pull or pressure on the trigger for firing may be considered by the jury with other evidence to determine whether a defendant's discharging a firearm was intentional or accidental. See *State v. Martin*, 195 Conn. 166, 487 A.2d 177 (1985). See, also, *State v. Hamilton*, 478 So. 2d 123 (La. 1985) (a firearm's requiring substantial trigger pull to fire the weapon, i.e., more than 4¹/₂ pounds pressure on the trigger, was a circumstance which the jury could consider in determining whether the defendant deliberately discharged the firearm); *People v. Quiles*, 172 A.D.2d 859, 569 N.Y.S. 2d 215 (1991) (a firearm's operable safety mechanism and requisite 7 to 7¹/₂ pounds of trigger pressure to fire the weapon were circumstances which may establish a defendant's intent to kill the victim); *Turner v. State*, 805 S.W.2d 423 (Tex. Crim. App. 1991) (heavy trigger pressure required to discharge a firearm is a

circumstance relative to determining whether discharge of the firearm was an intentional act). Consequently, the jury could have concluded that Rokus' firing the revolver in its double-action mode required a conscious and appreciable effort by Rokus. Thus, Rokus' intent to cause Kashuba's death may be inferred from circumstantial evidence, such as the type of weapon used, namely, a .44 Magnum which Rokus knew was loaded with hollow-point bullets; Rokus' manner of using the revolver, that is, his close-range pointing of the lethal weapon at the base of Kashuba's skull; and the nature of the wound inflicted on Kashuba, a contact wound, from Rokus' deliberate discharge of the revolver.

Therefore, the evidence at Rokus' trial, construed most favorably to the State, supports the jury's finding that Rokus intentionally caused Kashuba's death without premeditation. For that reason, Rokus' assignment of error is without merit; hence, we affirm Rokus' conviction and sentence.

AFFIRMED.