IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. JENSEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

VICTOR JENSEN, APPELLANT.

Filed November 17, 2015.    No. A-15-089.

Appeal from the District Court for Burt County, JOHN E. SAMSON, Judge, on appeal thereto from the County Court for Burt County, C. MATTHEW SAMUELSON, Judge. Judgement of District Court affirmed.

Patricia A. Knapp for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Following a jury trial in the county court for Burt County, Victor Jensen was convicted of two counts of mistreatment of a livestock animal in violation of Neb. Rev. Stat. § 54-903(2) (Reissue 2010) and four counts of neglect of a livestock animal in violation of § 54-903(1). He appealed his convictions to the district court for Burt County, which affirmed the convictions of mistreatment of a livestock animal and reversed and remanded for a new trial the convictions of neglect of a livestock animal. Jensen now appeals to this court, contending that the evidence was insufficient to support any of his convictions and that remanding the matter for a new trial on the four counts of neglect of a livestock animal violates the Double Jeopardy Clauses of the federal and state constitutions. We affirm.

- 1 -

At the time of the events at issue in this case, Jensen resided in the Silver Creek Township in Burt County, Nebraska, and maintained a herd of over 100 horses. On February 7, 2011, after the Burt County sheriff's office received complaints regarding the condition of Jensen's horses, a deputy sheriff obtained Jensen's permission to search his property and examine the horses. As a result of the search, Jensen was charged in October 2011 with nine counts (I-IX) of mistreatment of a livestock animal, each a Class I misdemeanor, and eight counts (X-XVII) of neglect of a livestock animal, also Class I misdemeanors. Jensen pled not guilty and the matter proceeded to a jury trial on June 16 to 18, 2014.

The State's three key witnesses were Deputy Robert Sparks of the Burt County sheriff's office, Kristie Biodrowski, a field director for the Nebraska Humane Society, and Dr. James Unwin, a veterinarian, all of whom participated in the search of Jensen's property. Biodrowski had worked for the Humane Society for 19 years and was a certified animal control officer and certified equine investigator. Dr. Unwin had been a veterinarian in Oakland, Nebraska, since 1977, and approximately 5% of his practice was equine. Because the testimony of these three witnesses was consistent and overlapped, we summarize it together.

Biodrowski and Dr. Unwin testified generally to horses' nutritional needs and the standard method for assessing a horse's physical condition. A horse needs approximately 1 gallon of water per 100 pounds of body weight per day, so an average 1,000-pound horse should consume 10 gallons of water per day. An average horse consumes 15 to 20 pounds of hay per day. In cold conditions, horses need to consume more food, because their bodies use more energy staying warm. Horses are messy eaters and normally will scatter hay around and leave "hay remnants" on the ground after eating. It would be unusual not to see hay remnants, because it would mean that the horses had eaten every bit of "wastage." It also would be unusual for a well-fed horse to eat bark off of a tree, although bored horses may at times chew on trees.

According to Biodrowski and Dr. Unwin, a 9 or 10 point scale is used to evaluate a horse's physical condition. The highest score means that a horse is obese, while the lowest score means that a horse is emaciated. A horse that scores 1 or 2 has lost all of its fat stores and is in need of immediate veterinary care. The horse's ribs, vertebrae, and hip points will be visible. A horse that scores 3 or 4 is not in a critical stage but should be assessed by a veterinarian within a week or two, and remedial measures should be taken. A score of 5 is "ideal." Dr. Unwin explained that, regardless of the size of the herd, he would hope to see no horses scoring 3 or below, or even 4 and below. Dr. Unwin testified that a well-cared for, well-fed horse should not be in the 3 to 4 range. Biodrowski testified that it would take "several months" or "several weeks" for a horse to decline to a body condition score of 1 to 2. Similarly, Dr. Unwin testified that you "wouldn't go from a very fat horse" to an emaciated horse "in 10 days"; he said it would take "[w]eeks or months."

On the day of the search, it was very cold. The search began in the early afternoon and continued until dusk. Just prior to the start of the search, Jensen had a brief conversation with Dr. Unwin in which Jensen said that he had some "thin" horses and that he thought some of the horses might have had "some blister beetle hay." Dr. Unwin asked Jensen if he had seen any "colic" in

his herd, which was a "severe bellyache" and "your basic clinical sign of blister beetle." According to Dr. Unwin, a horse with colic will kick at its stomach, go through "gyrations," and roll around. Jensen said he had not seen any colic in any of his horses.

Jensen's property fell within sections 16, 4, and 5 of the Silver Creek Township, and was searched in that order. Deputy Sparks, Biodrowski, and Dr. Unwin testified to the conditions in each section and to the horses found in each section.

In section 16, there was a 100-gallon water tank that had "just a little bit of ice" in it and no water. The tank was located in a pen with 17 horses, so the tank would have needed to be filled more than once per day to ensure the horses were adequately hydrated. The area of the ground not covered with snow was completely bare, with no grass, hay, or hay remnants. The trees had the bark completely stripped from them to the highest point the horses could reach. There were three deceased horses found in section 16, which were the subjects of counts I, II, and III and were shown in photographs admitted as exhibits 9, 11, and 12. The deceased horses were emaciated, scoring either 1 or 2. In addition, exhibit 13 was a photograph of a living horse found in section 16 that was emaciated and that was the subject of count X.

Addressing the deceased horse shown in exhibit 9, Biodrowski and Dr. Unwin explained that a pattern in the snow around the horse's legs, which was like a "snow angel" pattern, was evidence that the horse was "paddling" its legs back and forth as it lay dying. Dr. Unwin explained that a starving horse will "paddle" its legs like this because of the low glucose level in its brain. He also explained that a horse might paddle if it is in pain, but the pattern in the snow in exhibit 9 did not look like the horse "thrashed real hard," so he did not suspect pain as the cause.

In section 4, there was a 1,000-gallon water tank, but it was 80% full of ice, and it appeared that the horses had been chewing on the ice. The searching parties turned on the water and the horses "readily drank and appeared very thirsty." According to Biodrowski, there were eight horses in the pen with the tank, but there was not enough room left in the tank to adequately hydrate the horses unless the tank was filled multiple times a day. As in section 16, the area of the ground not covered with snow was completely bare, and the tree bark had been peeled away. The horse shown in exhibits 22 and 23 was located in section 4 and was very thin, bordering on emaciated; it was the subject of count XI.

In section 5, there were a total of 47 horses in 4 pens. Some of the pens had two 25-gallon water tanks; others had a 100-gallon tank; and one pen had a 1,000-gallon tank. The water tanks either had ice in them or were empty. When Sparks turned on the hydrant to fill the 1,000-gallon tank, which was 40% full of ice, the horses rushed to the tank to drink. Exhibits 28, 36, 38, 39, and 40 depicted a total of 6 dead horses located in section 5, all of which were very thin or emaciated. Biodrowski explained that one of the two deceased horses in exhibit 36 was "extremely emaciated," and "[t]hat horse stuck with me because I recall thinking at the time, looking at the horse, it was one of the thinnest horses I had seen." The second horse was less visible in the photograph but also appeared emaciated. The horses were the subjects of counts IV through IX. Exhibits 33, 34, 41, 42, 43, and 44 depicted horses in section 5 that were living but emaciated. They were the subjects of counts XII through XVII.

The horse depicted in exhibit 41 that was the subject of count XIV was too weak to stand. After a discussion, the searching parties agreed it would be best to euthanize the horse, which Dr.

Unwin did on the day of the search. He then performed a necropsy of the horse in the field, because he wanted to look for a reason the horses were in such poor condition. During the necropsy, Dr. Unwin "basically found no pathology" and no "pathological lesions." However, he did find that "[t]here was no internal fat in this horse at all," which was consistent with the horse's score of 1. He also found "erosions" on the horse's gums and "some fibrin tags on the liver," which he sent to a lab for examination. The lab report concluded that the fibrin tags resulted from parasitic migration through the liver.

Addressing the overall condition of Jensen's herd, both Biodrowski and Dr. Unwin testified that approximately 30% of the herd scored 1 or 2, approximately 40% scored 3 or 4, and the remaining 30% scored about 5. They both explained that part of the herd could be in poor condition while part of the herd was in good condition because of the social hierarchy of horses. When horses receive food and water, the dominant horses eat and drink first, while the less dominant horses get less food and water, or none. Alternatively, if the horses started in different conditions and declined at the same rate, the horses would continue to have different body scores as they all declined in condition.

Dr. Unwin testified that based on his inspection of Jensen's horses during the search, his opinion "to a reasonable degree of veterinary science" was that "these horses were not provided nutrients, water, hay, shelter like they needed to have been to have good welfare of these animals." He further testified that "if you fail to provide the proper nutrients, water, hay, shelter, like we have seen, these horses are going to--especially in the cold weather, they are going to go down," meaning "down in weight" and "down and dying." When asked if he was able to form an opinion as to whether the horses suffered and died from a lack of adequate nutrients, Dr. Unwin testified, "Yes. From our findings of posting that one mare, [and] looking at the others, it sure looks like these animals did not have adequate nutrients like they should have had."

On cross-examination, Dr. Unwin was asked whether he was able, with any degree of veterinary certainty, to determine the cause of death of any of the nine horses that were the subjects of counts I through IX, and he said, "No." In follow-up, Dr. Unwin explained that he could not perform necropsies on the nine horses because they were frozen solid. Dr. Unwin then testified that he believed that Jensen killed the nine horses, and defense counsel impeached him with his deposition testimony in which he testified that he had not formed an opinion within a reasonable degree of veterinary science as to whether Jensen killed any of the nine horses.

Deputy Sparks testified that Jensen told him on the day of the search that he provided feed and water to the horses once a day. Sparks further testified that on February 9, 2011, he and the sheriff met with Jensen in the sheriff's office, where they entered into an agreement with Jensen. Under the agreement, Jensen allowed Sparks to make routine checks of the animals, and the sheriff agreed to let Jensen keep the horses so that he could "try to get things turned around." The signed agreement provided that any horse with a score of 3 or under after February 23 would be rescued or "put down." Sparks testified that in the two months following execution of the agreement, he checked on the horses 25 times. On 23 of his 25 visits, Sparks had to put water in at least one tank. The condition of the horses improved over the two-month period.

The State's only other witness was Cheryl Pleskac. She testified that during the winter of 2010-2011, she drove past section 16 of Jensen's property twice a day as she went to and from

work. She observed that rarely was there feed of any kind for the horses, and as time went on, she saw the horses becoming thinner and thinner. She saw at least one deceased horse. She testified that the driveway to section 16 would remain snow-covered, with no tire tracks, for several days at a time.

After the State rested, Jensen's daughter, Kari Hanneman, was the first witness to testify on Jensen's behalf. She testified that during the winter of 2010-2011, she visited the farm every other weekend. When she was at the farm, she would help her father provide feed and water to the horses in the mornings and evenings. Because of the cold, the practice was to run the water while the horses drank, then shut off the water and leave the tank empty; otherwise, the water in the tanks would freeze. She explained that during snow storms the practice was to feed the horses only as much hay as they could eat because any leftover hay would be covered up with snow. She was aware that some of the horses were falling out of condition during the winter. She testified that her father attempted to find out why this was occurring.

Jensen testified that he was 67 years old and graduated from the University of Nebraska with a degree in animal science and veterinary science in 1968. He also completed veterinary technician school while in the Army. Raising and selling horses had been his full-time occupation since 1971. At times, he had as many as 220 horses in his herd and sold an average of 20 horses per year. In the winter of 2010-2011, he had 111 horses.

Jensen testified that his daily routine during the winter of 2010-2011 was to begin at daylight and to feed the horses grain, followed by hay, followed by water. He would make a second round and provide additional grain and water if necessary.

According to Jensen, he first noticed some of his horses having problems around October 15, 2010. He saw horses "losing massive amounts of weight," around "100 pounds a week." Each horse that lost weight had sores in its mouth, and its lips and gums would bleed. The first thing Jensen did was call his son, Dr. Justin Jensen, who was an equine veterinarian. He also contacted individuals at Texas A&M, Oklahoma State University, University of Nebraska, Louisiana State University, Penn State University, and Iowa State University, as well as county extension agents and veterinarians. Jensen's suspicion was that blister beetles were causing the horses' problems.

Addressing the deceased horse in exhibit 9, Jensen testified that he could "tell from the marks in the snow that it died with colic like symptoms" because it was "kicking with all four feet." Jensen also explained that he found sores in the horse's mouth after it died, as he did with other horses. Jensen testified that his problem horses began recovering after January 18, 2011, when he switched his hay to a type that typically did not have blister beetle in it. Prior to January 18, he had purchased hay from Ronald Keogh; the new hay came from elsewhere.

Jensen testified that the bare ground depicted in the exhibits existed because he changed feeding spots each day so the horses had a clean place to eat, which reduced problems with parasites. No hay remnants were visible because it had snowed 8 inches, which would have covered up any remaining hay. Jensen explained that the trees stripped of bark resulted from bored horses, which will chew on the trees. According to Jensen, the empty water tanks depicted in some of the exhibits were evidence that Jensen had watered properly the day before, because there was no ice or snow in the tanks. The tanks with frozen water either were not used during the winter or had sufficient space left in them to provide adequate water for the horses.

On cross-examination, Jensen admitted that no veterinarian examined the horses on his property between November 1, 2010, and February 7, 2011. Nor did he have any deceased horse necropsied during that time. Jensen testified that he sent a hay sample to the University of Nebraska during that time period, but after being shown a copy of the university's lab report, which was dated March 16, 2011, he admitted that he sent the hay after February 7. Jensen also testified that shortly after February 7 he sent two deceased horses to Iowa State University for necropsies to be performed. The final report of the necropsies, which was admitted into evidence, stated that the diagnosis for both horses was "inanition." Jensen testified that he did not know what that term meant. The report also stated that the horses were "devoid of subcutaneous, visceral, perirenal or cardiac fat."

On redirect examination, Jensen testified that his son, who is a veterinarian, examined the horses on Jensen's property during December 2010. It was on his son's recommendation that he changed his hay source in an attempt to resolve his horses' problems.

Jensen's son, Dr. Justin Jensen, testified that he was an equine veterinarian in Opelousas, Louisiana, and saw over 1,000 horses per month. In October 2010, his father contacted him and told him that some of his horses had lost weight after he began feeding them "dairy quality alfalfa hay." That month, Dr. Jensen visited his father's property and examined the horses. He observed "oral lesions" in the mouths of several horses. The lesions "tended to be more on the actual surface of the gums, away from the actual forceful mechanical nature of a stick or a fox tail stem."

Dr. Jensen testified that after he returned to Louisiana, he consulted with other veterinarians, including the owner of his veterinary practice. He then returned to his father's farm on December 20, 2010, and was there for 10 days. He examined his father's horses twice a day during that time. Following that trip, in January 2011, Dr. Jensen telephoned his father "saying that we need to switch the hay source, that even though the hay is the best physically looking hay, that there is some caustic or toxic substance that is located in that hay."

Dr. Jensen then testified that he was able to arrive at an opinion, within a reasonable degree of veterinary certainty, as to the cause of his father's horses' health problems. When asked what his opinion was, the State objected and was allowed to conduct voir dire of Dr. Jensen as to the foundation for his opinion. During the voir dire, Dr. Jensen testified that he found nothing in the hay being fed to his father's horses and did not perform any tests on the hay. He testified that his recommendation that his father change hay sources was the result of "a process of deduction" and basically amounted to trial and error. Following the voir dire, the court sustained the State's objection.

Dr. Jensen testified that he believed the more dominant horses in his father's herd were the ones afflicted with more mouth lesions than the younger, timid horses. He further testified that it was normal for horses to chew the bark off of trees out of boredom and that there were no adverse effects on the horses.

Dr. K.C. Ferrazzano testified that she was an equine veterinarian in Louisiana and practiced in the same group as Dr. Jensen. Between November 2010 and January 2011, Dr. Jensen consulted with her about the condition of his father's horses. She testified that she would have to perform a number of exams, including physical examinations, fecal exams, and blood tests, to conclude that

a horse was starving. She further testified that there were a number of toxic substances that could be found in hay that could affect some horses and not others within a herd.

Jensen also presented testimony from a county employee who plowed snow from the roads near Jensen's property during the winter of 2010-2011, a local farmer, and two neighbors. The county employee testified that he saw Jensen take hay to his horses on more than one occasion that winter. The local farmer testified that in 2010, he became aware that some of the hay he harvested in Burt County was suitable for feeding to cattle but not to horses. One neighbor testified that during that winter, some of Jensen's horses "were under severe stress" and did not look well, but the neighbor did not know what was wrong with the horses. Another neighbor testified that as late as the first week of December 2010, Jensen's horses appeared to be in good health.

After Jensen rested, the State called Ronald Keogh in rebuttal. Keogh testified that in 2010 he sold approximately 170 tons of hay to Jensen. The hay was grown in 2009, and he did not receive any complaints about blister beetle being found in any of the hay he grew in 2009. The only time he had found blister beetle in his hay was in the 1990's in one field. In 2010, Jensen picked up the hay he purchased from Keogh eight bales at a time, usually making two trips per week.

Also in rebuttal, Dr. Unwin testified that he believed that the erosions he found on the horse's mouth during the necropsy on February 7, 2011, were "mechanical erosions" that resulted from biting something rough like sticks or wood. He did not believe that they were pathological erosions. The stomach of the horse that he necropsied was empty, except for "gastrofolos spots," which were the larvae of the botfly that reside in horses' stomachs during the wintertime. The horse's empty stomach meant that it had not eaten anything for "some time," at least 12 to 24 hours. Dr. Unwin also testified that "inanition" is "a state of exhaustion due to prolonged lack of nutrients . . . basically starvation."

The jury returned verdicts finding Jensen guilty of counts V and VI charging mistreatment of a livestock animal, guilty of counts XIV through XVII charging neglect of a livestock animal, and not guilty of the remaining counts. The county court sentenced Jensen to 45 days' imprisonment plus 24 months' probation, imposed fines totaling $3,000, ordered him to complete 120 hours of community service, and prohibited him from owning or possessing any livestock animal for a total of 15 years (consisting of consecutive terms of 5 years imposed on counts V, VI, and XIV).

Jensen appealed to the district court, assigning as error that the county court erred (1) "with regard to the Jury Instructions presented"; (2) in not ordering Jensen's expert witness fees and costs paid by the county; and (3) in accepting the jury's guilty verdicts on counts V, VI, and XIV through XVII, which represented a "compromise on the part of the jurors" because the "evidence presented with regard to all 17 Counts" was the same.

In an order entered January 2, 2015, the district court noted that Jensen challenged the jury instructions for counts XIV through XVII, which charged neglect of a livestock animal, on the basis they did not list "low body score" as an element of the offense. The court rejected this argument but found plain error in that the jury instructions did not include the mental state of "intentionally, knowingly, or recklessly," which is an element of the offense. See § 54-903(1). Because of this omission, the court reversed Jensen's convictions on counts XIV through XVII

and remanded the matter to the county court for a new trial on those counts. The court determined that double jeopardy did not bar a retrial, because a rational trier of fact could have found Jensen guilty beyond a reasonable doubt based on the evidence presented.

The district court also rejected Jensen's argument that the jury reached a compromise verdict. The court disagreed with Jensen that the evidence was identical on each count, noting that each count was supported with a separate photograph of the horse that was the subject of the count, and that the State's witnesses provided detailed testimony regarding the condition of each horse. The court concluded that the evidence was sufficient to support Jensen's convictions on counts V, VI, and XIV through XVII.

Jensen timely appeals to this court.

## II. ASSIGNMENTS OF ERROR

Jenson assigns as error that the district court erred in (1) finding that the evidence was sufficient to support the convictions on counts V, VI, and XIV through XVII and (2) remanding counts XIV through XVII to the county court for a new trial.

## III. STANDARD OF REVIEW

Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *State v. Avey*, 288 Neb. 233, 846 N.W.2d 662 (2014). When reviewing a judgment for error appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## IV. ANALYSIS

Before we address Jensen's specific arguments, we address the State's observation that Jensen's statement of errors filed in the district court did not specifically challenge the sufficiency of the evidence but, in the State's words, asserted that "the evidence was the same for all counts thus there was a compromise verdict as a matter of law." Brief for appellee at 3. The State correctly cites the proposition that in reviewing decisions of the district court which affirm, reverse, or modify decisions of the county court, a higher appellate court will consider only those errors specifically assigned in the appeal to the district court and again assigned as error in the appeal to the higher appellate court. See *State v. Erlewine*, 234 Neb. 855, 452 N.W.2d 764 (1990).

Although Jensen's statement of errors filed in the district court did not specifically challenge the sufficiency of the evidence, the substance of his assignments of error before the district court and this court is the same. The reason is that, to the extent Jensen challenged his convictions on the basis that they resulted from a compromise among the jurors, his assignment of

error was cognizable only insofar as it sought review of the sufficiency of the evidence. See *United States v. Powell*, 469 U.S. 57, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984) (explaining that a criminal defendant's only safeguard against inconsistent verdicts resulting from mistake, compromise, or lenity is the ability to obtain independent review of the sufficiency of the evidence supporting his or her convictions). See, also, *State v. McBride*, 19 Neb. App. 277, 804 N.W.2d 813 (2011) (discussing *Powell*). Thus, the district court properly considered the sufficiency of the evidence in addressing Jensen's assignment of error, and we may properly consider his assignment of error before this court.

1. SUFFICIENCY OF EVIDENCE

Jensen contends that the State's evidence was insufficient to support his convictions of counts V, VI, and XIV through XVII because the State failed to prove that he caused or intended to cause the death or "debilitated condition" that befell some of his horses. Brief for appellant at 13. Jensen argues that "[g]iven that most of [his] horses, all being fed, watered, and cared for as a herd, were in normal to optimum condition, the causation of the debilitated condition among some was clearly at issue." Brief for appellant at 13. He contends that while the State proved "that the horses in the horrible photographs were dead or emaciated," it did not prove "the essential statutory element of why." Brief for appellant at 13. Similarly, Jensen maintains the State did not prove that he "intended to single the debilitated horses out for any less care than that which led to normal or optimum conditions in the rest of the herd." Brief for appellant at 13.

Although Jensen challenges the sufficiency of the evidence supporting his convictions of counts V, VI, and XIV through XVII together, we do not follow his lead. Counts V and VI charged Jensen with mistreatment of a livestock animal in violation of § 54-903(2), while counts XIV through XVII charged him with neglect of a livestock animal in violation of § 54-903(1). The two crimes are distinct and have different elements, which we outline below. Because of this and for clarity, we address the sufficiency of the evidence supporting his convictions of the two crimes separately.

(a) Mistreatment of Livestock Animal

As pertinent here, to prove that Jensen mistreated a livestock animal in violation of § 54-903(2), the State was required to establish that Jensen knowingly and intentionally killed or caused physical harm to a livestock animal in a manner that was not consistent with animal welfare practices. Neb. Rev. Stat. §§ 54-902(4); 54-903(2) (Reissue 2010). As noted above, Jensen's arguments pertain to the elements of causation and intent.

*(i) Causation*

The Nebraska Supreme Court has explained that "criminal conduct is a proximate cause of an event if the event in question would not have occurred but for that conduct; conversely, conduct is not a proximate cause of an event if that event would have occurred without such conduct." *State v. Muro*, 269 Neb. 703, 713, 695 N.W.2d 425, 432 (2005). The horses that were the subjects of counts V and VI were deceased, so the State was required to prove that but for Jensen's conduct, the horses would not have died.

The State's evidence relevant to the issue of causation consisted primarily of testimony from Deputy Sparks, Biodrowski, and Dr. Unwin regarding the conditions found on Jensen's property on February 7, 2011, combined with the Biodrowski's and Dr. Unwin's expert testimony. Biodrowski and Dr. Unwin testified that an average horse should consume 10 gallons of water and 15 to 20 pounds of hay per day; however, the testimony regarding the conditions on Jensen's property suggested that the horses were not receiving sufficient provisions. Sparks and Biodrowski testified that all of the water tanks they observed on Jensen's property were either empty or frozen. According to Biodrowski, some of the water tanks were small enough that they would have to have been filled more than once per day to adequately hydrate the horses; yet, according to Sparks, Jensen said his practice was to feed and water the horses only once per day. When Sparks turned on the hydrant to fill the partially frozen 1,000 gallon tank located in section 5, the horses rushed to the tank to drink.

Sparks, Biodrowski, and Dr. Unwin also testified to the lack of feed on Jensen's property. The ground was bare in places, and the trees had been stripped of bark up to the highest point the horses could reach. There were no hay remnants on the ground, which according to Biodrowski was unusual because horses are messy eaters and bare ground meant the horses had consumed all the "wastage." Consistent with the lack of feed, Dr. Unwin testified that the stomach of the horse he necropsied at Jensen's property on February 7, 2011, was empty, which meant the horse had not eaten anything for "some time," at least 12 to 24 hours. During the necropsy, Dr. Unwin also found that "[t]here was no internal fat in this horse at all," which was consistent with the horse's score of 1. Biodrowski and Dr. Unwin both testified that it would take a horse weeks or months to reach 1 or 2 on the scale and that a horse in this condition had lost all of its fat stores and was in need of immediate veterinary care. Pleskac testified that when driving by Jensen's property twice per day during the winter of 2010-2011, she rarely observed feed of any kind for the horses, and she observed the horses get thinner and thinner over time.

The two deceased horses that were the subjects of counts V and VI were depicted in exhibit 36 and were located in section 5. Biodrowski explained that one of the two horses was "extremely emaciated," and "[t]hat horse stuck with me because I recall thinking at the time, looking at the horse, it was one of the thinnest horses I had seen." The second horse was less visible in the photograph but also appeared emaciated. Dr. Unwin testified that based on his inspection of Jensen's horses during the search, his opinion "to a reasonable degree of veterinary science" was that the horses were not provided adequate nutrients, water, hay, and shelter. He further testified that failing to make these provisions, especially in cold weather, would result in the horses going "down," meaning "down in weight" and "down and dying." When asked if he was able to form an opinion as to whether the horses suffered and died from a lack of adequate nutrients, Dr. Unwin testified, "Yes. From our findings of posting that one mare, [and] looking at the others, it sure looks like these animals did not have adequate nutrients like they should have had."

Although Dr. Unwin testified on cross-examination that he was unable, with any degree of veterinary certainty, to determine the cause of death of any of the nine horses that were the subjects of counts I through IX, he clarified by explaining that he had been unable to perform necropsies on the nine horses because they were frozen solid (the horse he necropsied was the subject of count XIV). Dr. Unwin further testified on cross-examination that he believed Jensen killed the nine

horses, but he was then impeached with his deposition testimony in which he testified that he had not formed an opinion within a reasonable degree of veterinary science as to whether Jensen killed any of the horses. It was for the jury to decide whether this impeachment undermined Dr. Unwin's credibility. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

The primary conflicting evidence on the issue of causation came from Jensen and his son, Dr. Jensen, but their testimony suffered in a number of respects. Jensen testified that beginning around October 15, 2010, some of his horses began "losing massive amounts of weight," around "100 pounds a week," and developing mouth sores. Jensen testified that he suspected blister beetles as the cause and contacted his son, county extension agents, veterinarians, and individuals at a number of universities, including University of Nebraska and Iowa State University. On cross-examination, however, Jensen admitted that (1) other than his son, no veterinarian examined his horses between November 1, 2010, and February 7, 2011; (2) he did not send a hay sample to University of Nebraska for examination until after the search on February 7; and (3) he did not have any horses necropsied until after February 7 when he sent two deceased horses to Iowa State University. Jensen's testimony was further undermined when it was revealed that the necropsies resulted in diagnoses of "inanition," which Dr. Unwin explained is "a state of exhaustion due to prolonged lack of nutrients . . . basically starvation." The necropsies also revealed that the horses were "devoid of subcutaneous, visceral, perirenal or cardiac fat."

Dr. Jensen's testimony was no more helpful for Jensen on the issue of causation. Dr. Jensen testified that he examined his father's horses in October and December 2010, but the only findings to which he testified were the "oral lesions" he observed in the mouths of several horses. He did not offer any opinion as to the cause of the lesions, other than to say that they "tended to be more on the actual surface of the gums, away from the actual forceful mechanical nature of a stick or a fox tail stem."

Dr. Jensen further testified that in January 2011, he telephoned his father "saying that we need to switch the hay source, that even though the hay is the best physically looking hay, that there is some caustic or toxic substance that is located in that hay." However, when the State conducted voir dire of Dr. Jensen to investigate the foundation for his opinion as to the cause of the horse's health problems, it was revealed that his recommendation of changing hay sources was the result of "a process of deduction" and basically amounted to trial and error. Dr. Jensen testified that he performed no tests on the hay and found nothing in it. While Jensen testified that his horses began recovering after he switched hay sources at his son's suggestion on January 18, 2011, this testimony is difficult to reconcile with the conditions found on Jensen's property during the search on February 7, including the deceased and emaciated horses.

Jensen also challenges the evidence of causation on the basis that "most of [his] horses, all being fed, watered, and cared for as a herd, were in normal to optimum condition." Brief for appellant at 13. It appears that Jensen is relying on the testimony from Biodrowski and Dr. Unwin that 30% of the herd scored 1 or 2, approximately 40% scored 3 or 4, and the remaining 30% scored about 5. Even accepting Jensen's characterization of this testimony as meaning that most of his horses "were in normal to optimum condition," we disagree that it undermines the State's evidence of causation. Both Biodrowski and Dr. Unwin explained that part of the herd could be in poor condition while part of the herd was in good condition because of the social hierarchy of

horses; they explained that the dominant horses eat and drink first, while the less dominant horses get less food and water or none. An alternative explanation was that if the horses all started in different conditions and declined at the same rate, the horses would continue to have different body scores as they declined. Thus, the relatively better condition of some of the horses in Jensen's herd did not mean that he provided adequate feed, water, and care to the horses that declined in condition and died.

Based on the foregoing and after viewing the evidence in the light most favorable to the prosecution, we conclude that a rational finder of fact could have found that the State proved beyond a reasonable doubt that Jensen caused the deaths of the horses that were the subjects of counts V and VI.

### (ii) Intent

Jensen also argues the State failed to prove he intended to cause the deaths of his horses. In the context of a criminal statute, intentionally "'means willfully or purposely, and not accidentally or involuntarily.'" *State v. Rokus*, 240 Neb. 613, 620, 483 N.W.2d 149, 154 (1992), quoting *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986). "'The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding an incident.'" *Rokus*, 240 Neb. at 620, 483 N.W.2d at 154, quoting *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). "From circumstances around a defendant's voluntary and willful act, a jury may infer that the defendant intended a reasonably probable result of his or her act." *Rokus*, 240 Neb. at 621, 483 N.W.2d at 154.

The State presented significant circumstantial evidence to support a finding that Jensen intentionally and knowingly caused the deaths of the two horses that were the subjects of counts V and VI. Dr. Unwin testified that on February 7, 2011, prior to beginning the search, Jensen told him that he had some "thin" horses; thus, Jensen knew of the declining condition of his herd. Although Jensen told Dr. Unwin that he believed his horses had consumed "some blister beetle hay," Jensen further told Dr. Unwin that he had not seen any signs of colic, which Dr. Unwin explained was the "basic clinical sign of blister beetle." Even if Jensen believed that blister beetle hay was the cause of his horses' declining condition, the evidence of the conditions on his property supported the inference that he had failed to provide adequate feed, water, shelter, or other care for the ailing horses. The empty or frozen water tanks, the bare ground, and the trees stripped of bark all supported this inference.

When the evidence of the conditions on Jensen's property is viewed in light of the testimony from Biodrowski and Dr. Unwin that it would take weeks or months for a horse to reach 1 to 2 on the scale, and the testimony from Pleskac that she witnessed Jensen's herd getting thinner and thinner over the winter months, it becomes clear that a rational finder of fact could have found that the State proved beyond a reasonable doubt that Jensen intentionally caused the horses to decline in condition and die in a manner that was not consistent with animal welfare practices. Again, Jensen was aware of the declining condition of his herd, and it took a significant amount of time for Jensen's horses to reach such a poor condition. Despite the horses' declining health and the passage of time, Jensen failed to adequately feed, water, or provide necessary care to his horses.

After viewing this evidence in the light most favorable to the prosecution, we conclude that a rational finder of fact could have found that Jensen knew his horses needed care and by failing to provide it, intended the reasonably probable result of poor health and death.

### (b) Neglect of Livestock Animal

We next address the sufficiency of the evidence supporting Jensen's convictions of neglect of a livestock animal in counts XIV through XVII. As pertinent here, to prove that Jensen committed neglect, the State was required to establish that Jensen intentionally, knowingly, or recklessly failed to provide a livestock animal in his care, whether as owner or custodian, with feed, water, or other care as was reasonably necessary for the livestock animal's health. §§ 54-902(5); 54-903(1).

We have already concluded that the State proved beyond a reasonable doubt that Jensen mistreated the horses that were the subjects of counts V and VI by intentionally and knowingly causing their deaths. Notably, to be guilty of misdemeanor neglect under § 54-903(1), a person need not kill or cause physical harm to a livestock animal, as is required to be guilty of mistreatment under § 54-903(2); rather, a person need only fail to provide feed, water, or other care as is reasonably necessary for the livestock animal's health. Given the emaciated condition of the horses that were the subjects of counts XIV through XVII, and given the evidence of the conditions on Jensen's property, we have little difficulty concluding that a rational fact finder could have found that the State proved beyond a reasonable doubt that Jensen intentionally, knowingly, or recklessly failed to provide the horses with necessary feed, water, or other care. We need not recount the State's evidence yet again to reach this conclusion.

### 2. DOUBLE JEOPARDY

Jensen also argues that after the district court reversed his convictions of counts XIV through XVII based on faulty jury instructions (which the State concedes were faulty), the district court violated double jeopardy principles when it remanded the counts for a new trial. The Double Jeopardy Clauses of the state and federal constitutions protect a criminal defendant against a second prosecution for the same offense after acquittal or conviction. *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011). If a criminal conviction is reversed based on prejudicial error, however, a retrial is not prohibited as long as the sum of all the evidence admitted, erroneously or not, is sufficient to sustain a guilty verdict. *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014). We have already concluded that the evidence was sufficient to sustain the guilty verdicts on counts XIV through XVII. Therefore, double jeopardy principles do not forbid a retrial.

### V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Burt County, which affirmed Jensen's convictions of counts V and VI and reversed and remanded for a new trial Jensen's convictions of counts XIV through XVII.

AFFIRMED.