## STATE OF CONNECTICUT *v.* DAVID GHERE
### (11730)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

Argued June 4—decision released August 26, 1986

*Stephen M. Prignano,* certified legal intern, with whom were *Timothy H. Everett* and, on the brief, *Kerry Wisser,* certified legal intern, for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, and *Patrick J. Clifford,* assistant state's attorney, for the appellee (state).

SANTANIELLO, J. By substitute information, the defendant, David Ghere, was charged in the first count

with the crime of attempted robbery in the first degree as an accessory, in violation of General Statutes §§ 53a-134 (a) (3), 53a-49 (a) and 53a-8, in the second count with conspiracy to commit robbery in the first degree, in violation of General Statutes § 53a-48 (a), and in the third count with assault in the second degree, in violation of General Statutes § 53a-60 (a) (2). After a jury trial, he was found guilty of the crimes charged and was sentenced to an effective prison term of not less than seven nor more than fourteen years. On appeal, he claims: (1) that there was insufficient evidence to support his conviction on the first and second counts; and (2) that the trial court erred in allowing the state to impeach the testimony of the defendant's alibi witnesses by exposing their failure to volunteer exculpatory information to the police. We find no error.

I

We examine first the defendant's claim that the state presented insufficient evidence to support his conviction for the crimes of accessory to attempted robbery in the first degree and conspiracy to commit robbery in the first degree. In considering this claim, "[w]e are obligated to review the evidence as favorably as possible with a view toward sustaining the verdict and then to decide whether the verdict is one which jurors acting reasonably could have reached. *State* v. *Maturo,* [188 Conn. 591, 601, 452 A.2d 642 (1982)]; *State* v. *Jeustiniano,* 172 Conn. 275, 281–82, 374 A.2d 209 (1977). Evidence is sufficient to sustain a verdict if the jury could reasonably have concluded, upon the facts established and the reasonable inferences drawn therefrom, that the defendant's guilt was proven beyond a reasonable doubt. *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978)." *State* v. *Maltese,* 189 Conn. 337, 344, 455 A.2d 1343 (1983); see also *State*

v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986); *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983).

To establish its case, the state relied heavily on the testimony of the victim, Marc Perkis.[1] He testified at trial as follows: On March 20, 1981, at approximately 5 to 5:30 p.m., he drove into the parking lot of the Stop & Shop Supermarket on South Colony Road in Wallingford with the intention of buying groceries. He parked his car in a spot two to three hundred feet from the store with the front end of the car against a chain link fence. Another car was parked on the driver's side and there was only a two or three foot space between the two cars. As the victim stepped out of his car, he noticed two men walking toward him from across the lot. They came up to him and blocked his way to the store, standing at the rear of his car.

The victim described the two men in detail. The first man was between six feet, four or five inches tall, approximately nineteen to twenty-two years old and had long light brown hair about an inch from the shoulder. He was relatively clean shaven but had some whiskers growing on his chin and upper lip. He wore a dungaree jacket, a pair of blue jeans that was ripped at the knees, a belt with a large brass buckle and a pair of black leather motorcycle boots in poor repair. The second man was the person whom the victim later identified as the defendant. He was approximately six feet tall, in his late twenties or early thirties and had dark brown hair of shoulder length. He had broad shoulders and a heavier build than that of the first man, untrimmed facial hair under his nose and chin and prominent scars and pockmarks on his face like those left by severe acne. He wore a "very old, very dirty"

---

[1] The state also called two Wallingford police officers. They corroborated the victim's characterization of the events, testifying, inter alia, on the way the victim came into the police station, his physical condition, how he gave his statement to them and how he identified the defendant.

sleeveless denim jacket which had several patches, including one bearing a motorcycle insignia. He also wore ripped blue jeans with patches and black motorcycle boots in relatively poor condition.

The first man confronted the victim and "asked [him] for money . . . ." The victim responded that he "did not have any money." Apparently not satisfied with the response, the first man became indignant and retorted: "If you are going shopping you have to have some money." The victim, who described himself as "a little annoyed" at this point, replied that "I don't [have money]. I pay by check . . . [w]ould you like a check?"

Within one or two seconds of the last verbal exchange, the second man stepped toward the victim and displayed a blackjack approximately eight to ten inches long. The victim had not noticed the weapon up to this point in time because the man had concealed it behind his back. The man immediately swung the blackjack at the victim and struck him in the face below the eye causing him to reel back against his car. The same man then punched the victim "[a] couple of times" in the stomach and, as he fell to the ground, struck him again over the head. Once on the ground, the victim feigned unconsciousness and heard the second man call to the first: "Come on let's get back to the shop." Then, without searching the victim, the two men quickly left the parking lot.

The victim remained on the ground for a few minutes before being able to pull himself up into his car. When he felt well enough to drive, he went directly to the Wallingford police station and related what had happened. The police took a general description of the assailants and then sent the victim to the hospital by ambulance. After being treated and released, the victim returned to the police station at approximately 9 p.m. and gave a full statement describing the two men

and the attack. The victim also viewed a photographic array containing six to seven photographs, selected a photo of the defendant and identified him as the man who had hit him with the blackjack. He stated that he was "extremely positive" about this identification. He later viewed another array containing approximately ten to fourteen photos and again selected the defendant's photograph.[2] The victim testified that "there [was] no doubt in [his] mind" that the defendant was the man who had struck him.

The defendant presented an alibi defense at trial. He took the stand himself and testified that on the day of the alleged crimes he had visited a friend at Hartford Hospital and then had gone to the workshop of his club, the Diablos motorcycle club, in Meriden between 5 and 5:30 p.m. There he had unloaded his motorcycle from the back of his truck and had worked around the shop for a few hours before going home. The defendant called three witnesses who testified that he had been at the hospital on the afternoon in question, one of whom said that he had remained there until 4 p.m. He called two additional witnesses who testified that he had been at the Diablos club from 5:10 or 5:20 p.m. until later that evening. It was also established during the examination of the defendant and his witnesses, however, that he had worn a sleeveless denim jacket with motorcycle and Diablos club patches at the time the crimes took place.

### A

The defendant claims that there was insufficient evidence to convict him of being an accessory to the crime

---

[2] The victim also made an in-court identification of the defendant. Although the defendant has implied that the identifications were unreliable, he does not argue that they were the product of unnecessarily suggestive police procedures and does not contest their admission into evidence. See State v. Boucino, 199 Conn. 207, 219–20, 506 A.2d 125 (1986).

of attempted robbery in the first degree. He does not challenge the jury's conclusion that there was sufficient concert of action between him and his accomplice to support the accessory allegations made under General Statutes § 53a-8.[3] He argues instead that there was insufficient proof: (1) of his intent to commit larceny in that the assailants' actions constituted, at the most, "aggressive panhandling"; and (2) that he used or threatened to use force "in the course of" attempting a larceny as required under General Statutes § 53a-133. We disagree.

A person is guilty of criminal attempt if, acting with the kind of mental state required for the commission of the crime, he intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be, or intentionally commits an act which constitutes a substantial step in a course of conduct planned to culminate in the commission of the crime. General Statutes § 53a-49;[4] *State*

---

[3] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] "[General Statutes] Sec. 53a-49. CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contem-

v. *Green,* 194 Conn. 258, 276, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. Simple robbery becomes robbery in the first degree if, "in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . uses or threatens the use of a dangerous instrument." General Statutes § 53a-134 (a) (3).[5]

---

lated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a), it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[5] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirm-

Turning to the defendant's claim concerning intent, we note from the relevant statutes that the state was required to establish beyond a reasonable doubt the defendant's intent to commit larceny in order to obtain a conviction for attempted robbery in the first degree. *State* v. *Morrill,* 193 Conn. 602, 608–609, 478 A.2d 994 (1984). Generally, such an intent can be inferred from the conduct and statements of the defendant or his accomplice. Id., 609; *State* v. *Sober,* 166 Conn. 81, 92–93, 347 A.2d 61 (1974). " 'The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. *State* v. *Rodriguez,* 180 Conn. 382, 404, 429 A.2d 919 (1980).' *State* v. *Martin,* 195 Conn. 166, 170, 487 A.2d 177 (1985)." *State* v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986). Reviewing the evidence in this case, we reject the defendant's characterization of the assailants' behavior as panhandling and conclude that the jury could reasonably have inferred from this conduct that the defendant intended to commit larceny. The defendant and his accomplice approached the victim in a nearly deserted parking lot and hemmed him in between two cars. One of them aggressively demanded money while the other stood nearby armed with a dangerous weapon. The request for money was not, as the defendant suggests, made in the form of a casual request for a handout, but instead was made in the form of a demand. Furthermore, the fact that the defendant struck the victim shortly after his accomplice made the demand indicated the assailants' apparent intent to force the victim to comply.

The defendant also proffers the argument that there was insufficient evidence that he used or threatened

ative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

to use force "in the course of" attempting the larceny under General Statutes § 53a-133 and that, as a result, he could not be found guilty of attempted robbery in the first degree.[6] He correctly assumes that the elements of simple robbery under the definition provided in General Statutes § 53a-133 must be proven before robbery in the first degree is established. He also correctly argues that it was necessary for the state to establish that the defendant had used or threatened to use force "in the course of" attempting a taking of the victim's property in order to sustain a conclusion that the defendant had undertaken "substantial step[s]" in furtherance of the alleged crime under the attempt statute, § 53a-49. *State* v. *Coston,* 182 Conn. 430, 435, 438 A.2d 701 (1980). We cannot agree with the defendant's position, however, that the use of force was not "in the course of" the attempted robbery because the assault of the victim occurred subsequent to the demand for money. It is well established that, under General Statutes § 53a-133, if the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be "in the course of" the robbery or the attempted robbery within the meaning of the statute. *State* v. *Gordon,* 185 Conn. 402, 410–11, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Gunning,* 183 Conn. 299, 313 n.12, 439 A.2d 339 (1981); *State* v. *Coston,* supra, 435–36; *State* v. *Velicka,* 143 Conn. 368, 371–72, 122 A.2d 739 (1956); see also 2 Model Penal Code and Commentaries (1980) § 222.1, comment 2. In the present case, although the defend-

---

[6] The defendant does not contest the fact that the alleged use of force in this case would satisfy the requirement in General Statutes § 53a-134 (a) that it be used "in the course of the commission of the crime *or of immediate flight therefrom* . . . ." (Emphasis added.) He apparently concedes that the use of force could be deemed to have occurred in the flight from the attempt.

ant could have assaulted the victim for any number of reasons, including frustration, anger, fear or desire to keep the victim from pursuing him, the assault occurred within seconds of the demand for money. The blackjack was also apparently in the defendant's hand while the demand was made. From these facts the jury could reasonably have concluded that the force used "was within the sequence of events directly connected with the attempted robbery." *State* v. *Velicka,* supra, 372. The jury therefore could reasonably have found the defendant guilty of attempted robbery in the first degree as an accessory.[7]

### B

The defendant next claims that there was insufficient evidence to sustain his conviction of conspiracy to commit robbery in the first degree. To establish the crime of conspiracy under General Statutes § 53a-48 (a),[8] "the state must show that [1] there was an agreement between two or more persons to engage in conduct constituting a crime . . . [2] the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators . . . [and (3) there was] intent on the part of the accused that conduct constituting a crime be performed." *State* v. *Ortiz,* 169 Conn. 642,

---

[7] It was also reasonable for the jury to conclude from the evidence that the two men intimidated the victim by their actions and request, and thereby threatened the use of force "in the course of" attempting larceny within the meaning of General Statutes § 53a-133.

[8] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

645, 363 A.2d 1091 (1975). The defendant claims that there was insufficient evidence on each element of the crime.

On the question of the defendant's intent, we have already found that the jury could reasonably have concluded that he possessed the intent to commit larceny. Since the assault was also committed in furtherance of the attempted taking and was done by use of a dangerous instrument, there is no doubt that the jury also could reasonably have concluded that he possessed the intent to commit robbery in the first degree under General Statutes §§ 53a-133 and 53a-134 (a) (3).

On the issue of confederation, we note at the outset that the existence of a formal agreement between the conspirators need not be proved. *State* v. *Johns,* 184 Conn. 369, 378, 439 A.2d 1049 (1981); *State* v. *Marra,* 174 Conn. 338, 344, 387 A.2d 550 (1978). " 'Conspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. *State* v. *Faillace,* 134 Conn. 181, 185, 56 A.2d 167 [1947]. It is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. The combination or confederation may be proved by circumstantial evidence, that is, by proof of the separate acts of the individuals accused and by proof of circumstances from which the illegal confederation may be inferred. *State* v. *Gerich,* 138 Conn. 292, 297, 83 A.2d 488 [1951].' *State* v. *Holmes,* 160 Conn. 140, 150, 274 A.2d 153 (1970)." *State* v. *Baker,* 195 Conn. 598, 604, 489 A.2d 1041 (1985). In this instance, the proof that the defendant and his companion confronted the victim and hemmed him in between two cars while one demanded money and the other stood by silently with a dangerous weapon in his hand was sufficient evidence from which the jury reasonably could infer that there existed an agreement

between the two assailants. "It was enough if they knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Holmes,* supra, 149.

On the issue of the existence of an overt act in furtherance of the crime, it is important to emphasize that the essence of the offense of conspiracy is the unlawful combination and an act done in pursuance thereof, not the successful accomplishment of the objective of the conspiracy. *State* v. *Beccia,* 199 Conn. 1, 3, 505 A.2d 683 (1986); *State* v. *Devine,* 149 Conn. 640, 647–48, 183 A.2d 612, cert. denied sub nom. *Cooper* v. *Connecticut,* 371 U.S. 930, 83 S. Ct. 303, 9 L. Ed. 2d 237 (1962). Thus, although robbery in the first degree may have been the conspirators' object, the failure of the attempt does not preclude a conviction for the inchoate crime of conspiracy. The state charged the defendant with committing the overt act of assaulting the victim with a dangerous instrument in pursuance of the crime of robbery in the first degree. Since we have already found that it was reasonable to conclude that the assault was committed "in the course of" the attempted robbery under General Statutes § 53a-133, and that this act constituted a "substantial step" toward the commission of robbery in the first degree within the meaning of General Statutes § 53a-49, we also find that the jury could reasonably have believed that the assault was "an overt act in pursuance" of the conspiracy under General Statutes § 53a-48 (a). There is sufficient evidence, therefore, to sustain his conviction of conspiracy to commit robbery in the first degree.

## II

The final claim raised by the defendant challenges the propriety of the trial court's ruling allowing the state's attorney to impeach the defendant's alibi witnesses by exposing their failure to tell the police their story in support of the alibi. He argues that evidence

of the witnesses' silence was irrelevant and, therefore, inadmissible.[9] He also claims that the state's attorney's closing argument to the jury using this evidence was improper. We do not agree.

The state filed a demand for notice of alibi on April 14, 1981, but the defendant, in violation of the time requirements of Practice Book § 763, did not comply until August 19, 1982, some sixteen months later. The trial court, in its discretion, nevertheless allowed the witnesses to testify and trial commenced on August 23, 1982. As previously noted, the defendant called five alibi witnesses. Three testified that they had seen him at Hartford Hospital a few hours before the crimes were committed and two testified that they had seen him in Meriden at the exact time the crimes were committed. Each of these witnesses was either a friend or an acquaintance of the defendant and was in some way associated with the Diablos motorcycle club. When cross-examining four of the witnesses, the state's attorney asked each if they had informed the police that he or she had seen the defendant on the day

---

[9] The defendant also argues that the trial court, by permitting the state's attorney to impeach his witnesses under this theory, denied him his sixth amendment right to present a defense. See *State* v. *Boucino,* 199 Conn. 207, 213–14, 506 A.2d 125 (1986); *State* v. *McKnight,* 191 Conn. 564, 580, 469 A.2d 397 (1983). The defendant objected to the state's attorney's questioning and argument only on the ground that such evidence was irrelevant and never raised this constitutional claim below. The defendant cites no case law to support the position that mere impeachment of the credibility of alibi witnesses implicates the right to present a defense. In our judgment the defendant has placed a "constitutional tag on a nonconstitutional claim." *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). Because the sixth amendment claim was not distinctly raised below and because the record does not adequately support a claim that the defendant was clearly deprived of a fundamental right and a fair trial, we do not review its merits. *State* v. *Tyler-Barcomb,* 197 Conn. 666, 674–75 n.5, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); *State* v. *Evans,* 165 Conn. 61, 69, 327 A.2d 576 (1973). The focus of our discussion is therefore limited to the relevance of the state's attorney's questioning.

of the crime. The defendant each time objected to these questions on the ground of relevance, but his objections were overruled.

During the closing arguments to the jury, the state's attorney attacked the defense witnesses' credibility on various grounds, including the observation that the witnesses were friends of the defendant, that the dates and times might have been inaccurate because of the effect of time on their memory, and that there was no way to verify their testimony because they had not given a formal statement prior to trial. In raising the possibility of fabrication, the state's attorney pointed out that the defense counsel had been able to impeach the victim's testimony by using his prior statement to the police, but that the defendant's witnesses could not be similarly cross-examined because "they did not give any statements to anyone."[10] The defense counsel during her closing arguments attempted to bolster the witnesses' credibility despite their failure to go to the police by noting that: "If [the witnesses] have not gone to the police department to say: listen, a terrible wrong [has been] committed here, isn't it natural that these peo-

---

[10] The state's attorney argued: "[They are] going back 18 months and recalling, what occurred on this supposed date of March 20. Remember that these people gave no statements, no formal statements that they gave that, for example, I might have to cross-examine from like [the one] Mr. Perkis gave to the police. They are going back and recalling off the top of their heads.

\* \* \*

"For example Perkis' statement was put under a microscope and every little bit of the description was pulled out for you, and he was cross-examined on it. But you cannot do that with the defense's witnesses like Laura · DeAndrade and Keith Woodtke and Bob Woodtke because they did not give any statements to anyone.

\* \* \*

"Once again, [Larry Gilbert was] someone who did not give any statement to anyone. Obviously, he did not go down to the police and tell them that he had this firm alibi for his friend David Ghere."

ple would go testify just like they have?" The defendant later objected to the state's attorney's arguments, claiming that it was improper to impeach the alibi witnesses by bringing to light their failure to make statements to the police.

The principles by which we judge the propriety of the trial court's ruling on the relevance of the state's attorney's questioning are well settled. "The scope of cross-examination in a criminal trial is a matter properly left to the sound discretion of the trial court . . . . Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. Reversal is required only where an injustice appears to have occurred. *State* v. *Martin,* 170 Conn. 161, 365 A.2d 104 [1976]; *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186 [1975]." *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). Generally, evidence is admissible when it tends to establish a fact in issue or corroborates other direct evidence in the case. *State* v. *McClendon,* 199 Conn. 5, 8–9, 505 A.2d 685 (1986); *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). Thus, "if evidence adduced on cross-examination conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should be admitted." *State* v. *Briggs,* supra, 332; *Delmore* v. *Polinsky,* 132 Conn. 28, 31, 42 A.2d 349 (1945). Clearly in the case at hand, the credibility of the alibi witnesses was properly in issue and it was permissible for the state's attorney to inquire into the circumstances surrounding the alibi on cross-examination in an attempt to discredit the alibi claim. *State* v. *Briggs,* supra, 333. The question before us, therefore, is relatively narrow: whether the failure of the witnesses to approach the police with their alibi

story was relevant on the issue of credibility or, more specifically, the issue of fabrication.

We have never specifically addressed the relevance of such questioning in the context raised at trial. The defendant claims that silence is "inherently ambiguous" and that an alibi witness's failure to volunteer information is, therefore, of little, if any, probative value. In cases involving the use of the defendant's silence in the face of accusation under *Doyle* v. *Ohio,* 426 U.S. 610, 617, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), we have recognized that a defendant's post-arrest silence following *Miranda* warnings was "insolubly ambiguous." *State* v. *Morrill,* 197 Conn. 507, 535, 498 A.2d 76 (1985); see *United States* v. *Hale,* 422 U.S. 171, 177, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975). Outside of the narrow confines of *Doyle,* however, the "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadbourn Rev. 1970)." *Jenkins* v. *Anderson,* 447 U.S. 231, 239, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980). Although we do not believe that an alibi witness has a duty to report an alibi story to the police or, for that matter, to any other person, a witness in many instances naturally may be expected to convey such information, especially when the witness is friendly with the accused. Failure of the witness to do so would, under these circumstances, constitute grounds for impeachment. See *United States* v. *Carr,* 584 F.2d 612, 617–18 (2d Cir. 1978), cert. denied, 440 U.S. 935, 99 S. Ct. 1280, 59 L. Ed. 2d 494 (1979); *People* v. *Davis,* 156 Cal. App. 3d 920, 203 Cal. Rptr. 338, 343–44 (1984); *People* v. *Welte,* 77 Ill. App. 3d 663, 665–66, 396 N.E.2d 315 (1979); *People* v. *LaFayette,* 138 Mich. App. 380, 389, 360 N.W.2d 891 (1984); *Commonwealth* v. *Rodgers,* 472 Pa. 435, 459, 372 A.2d 771 (1977); cf. *People* v.

*Dawson,* 50 N.Y.2d 311, 406 N.E.2d 771, 428 N.Y.S.2d 914 (1980); see generally annot., 20 A.L.R.4th 245, 267–77.

The alibi witnesses in this case were shown to be friends or acquaintances of the defendant and it would only have been natural for them to exculpate the defendant of any wrongdoing by approaching the police. We therefore conclude that the trial court correctly allowed the state's attorney to impeach the alibi witnesses by questioning their failure to relate their stories to the police. Because we find that the impeachment of the alibi witnesses was justified, the defendant's claim that the state's attorney's final argument was improper is similarly unavailing.[11]

There is no error.

In this opinion the other justices concurred.

---

[11] The defendant in passing proffers the additional argument that the state's attorney improperly argued to the jury that the alibi witnesses had a duty to approach the police. The record does not support such a claim. In fact, the state's attorney openly admitted in explaining his questioning that: "I am not sure [a witness] has a duty but I am curious whether [he] did go down."