******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KELLER, J., dissenting. I respectfully dissent. I conclude that under the facts and circumstances of this case, as well as the analysis established in our Supreme Court precedent, the absence of the instruction mandated by *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), was harmless beyond a reasonable doubt. I do not believe there is a reasonable probability that a properly instructed jury would reach a different result based on its required analysis of the factors enunciated in *Salamon*. Therefore, I would affirm the judgment of the habeas court denying the amended petition for a writ of habeas corpus filed by the petitioner, Mark Banks.

The majority correctly states both the standard of review and the burden of the respondent, the Commissioner of Correction. Thus, I begin with a discussion of the *Salamon* decision, because I believe the majority strays too far from the rule enunciated therein, which distinguishes a kidnapping from a restraint that is incidental to and necessary for the commission of some other crime against a victim.[1]

The facts in *Salamon* involved the defendant being charged with kidnapping in the second degree as a result of the following conduct.[2] "The victim disembarked the train in Stamford and began walking toward a stairwell in the direction of the main concourse. At that time, the victim noticed the defendant, who was watching her from a nearby platform. As the victim approached the stairwell, she observed that the defendant was following her. The defendant continued to follow the victim as she ascended the stairs. Before the victim reached the top of the stairs, the defendant caught up to her and grabbed her on the back of the neck, causing her to fall onto the steps. The victim, who had injured her elbow as a result of the fall, attempted to get up, but the defendant, who had positioned himself on the steps beside her, was holding her down by her hair. The victim screamed at the defendant to let her go. The defendant then punched the victim once in the mouth and attempted to thrust his fingers down her throat as she was screaming. Eventually, the victim was able to free herself from the defendant's grasp, and the defendant fled. . . . According to the victim, the altercation with the defendant lasted at least five minutes." Id., 515.[3]

In *Salamon*, our Supreme Court held that "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. The court noted that the issue in *Salamon* "directly implicates only a relatively narrow category

of criminal cases, that is, kidnapping cases in which the restraint involved is incidental to the commission of another crime." Id., 523.

"First, in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that *the substantive crime could not have been committed without such acts* . . . . In other words, the test . . . to determine whether [the] confinements or movements involved [were] such that kidnapping may also be charged and prosecuted when an offense separate from kidnapping has occurred asks whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution. . . .

"Conversely, a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. . . .

"Second, we do not retreat from the general principle that an accused may be charged with and convicted of more than one crime arising out of the same act or acts, as long as all of the elements of each crime are proven. Indeed, because the confinement or movement of a victim that occurs simultaneously with or incidental to the commission of another crime ordinarily will constitute a substantial interference with that victim's liberty, such restraints still may be prosecuted under the unlawful restraint statutes. Undoubtedly, many crimes involving restraints already are prosecuted under those provisions." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) Id., 546–48. Our Supreme Court noted that the rule of *Salamon* "is relatively narrow and directly affects only those cases in which the state cannot establish that the restraint involved had independent significance as the predicate conduct for a kidnapping" and would not "force a major shift in prosecutorial decision making."

Id., 548.

The Supreme Court also stated that "[f]or purposes of making [the] determination [of whether a criminal defendant's movement or confinement of a victim was necessary or incidental to the commission of another crime] the jury should be instructed to consider the various relevant factors, including [1] the nature and duration of the victim's movement or confinement by the defendant, [2] whether that movement or confinement occurred during the commission of the separate offense, [3] whether the restraint was inherent in the nature of the separate offense, [4] whether the restraint prevented the victim from summoning assistance, [5] whether the restraint reduced the defendant's risk of detection and [6] whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." Id. I believe an analysis of the *Salamon* factors, half of which the majority does not analyze in any detail, requires affirmance of the kidnapping convictions in this case.

Prior appeals addressing the lack of a *Salamon* instruction at a criminal trial in which the defendant or habeas petitioner was convicted of both kidnapping and an underlying offense reveal that the determination of whether the absence of such an instruction was harmless beyond a reasonable doubt is highly dependent on the facts and circumstances of each case. "Analyses of *Salamon* claims have focused on a variety of factors in determining whether a kidnapping conviction can stand, but the timing, location, and manner in which the [petitioner] commits criminal acts against a victim are particularly crucial factors." *Wilcox* v. *Commissioner of Correction*, 162 Conn. App. 730, 743, 129 A.3d 796 (2016).

After *Salamon*, this court and our Supreme Court have concluded that restraining a victim for a brief duration in connection with an underlying offense can still constitute kidnapping. See *State* v. *Ward*, 306 Conn. 718, 736–37, 51 A.3d 970 (2012); *State* v. *Lewis*, 148 Conn. App. 511, 517, 84 A.3d 1238, cert. denied, 311 Conn. 940, 89 A.3d 349, cert. denied,        U.S.    , 135 S. Ct. 132, 190 L. Ed. 2d 101 (2014); *State* v. *Ayala*, 133 Conn. App. 514, 522–23, 36 A.3d 274, cert. denied, 304 Conn. 913, 40 A.3d 318 (2012).[4]

This court has observed that the movement and confinement of a victim after the defendant commits the underlying offense is more likely to have independent criminal significance. See *White* v. *Commissioner of Correction*, 170 Conn. App. 415, 436, 154 A.3d 1054 (2017); see also *State* v. *Golder*, 127 Conn. App. 181, 190–91, 14 A.3d 399, cert. denied, 301 Conn. 912, 19 A.3d 180 (2011). In *State* v. *Golder*, supra, 183, the defendant entered the victim's residence with the intent to steal her jewelry. Upon unexpectedly encountering the victim inside the residence as she walked toward her bed-

room, the defendant grabbed her, moved her to the kitchen while holding her in a bear hug, released her, and took a bag of jewelry from the closet. Id., 184. At that point, the defendant told the victim that he was going to have to put her in the basement, but changed his mind after the victim told him she was claustrophobic and asthmatic, and moved her instead to the bedroom. Id. The defendant then "asked if she had any rope. [The victim] responded that she did not have any, so the defendant took some neckties . . . and 'hogtied' her to the bed. The defendant then asked [the victim] where she kept her car and where the keys for it were located. [The victim] told him the keys were in her pocketbook, and the defendant went into the kitchen. [The victim] attempted to release herself from the bed, and the defendant returned to ask [the victim] if the car had an alarm. When the defendant left for the second time, [the victim] freed herself and called 911. [The victim] was tied to the bed for a total of twenty to twenty-five minutes." Id., 184–85. On the basis of these facts, this court concluded that there was no reasonable possibility that the jury was misled by the lack of a *Salamon* instruction. Id., 191.

Faced with a similar issue, this court reached the same result in *Nogueira* v. *Commissioner of Correction*, 168 Conn. App. 803, 845, 149 A.3d 983, cert. denied, 323 Conn. 949, 169 A.3d 792 (2016), and concluded that a reasonable fact finder could not find that the petitioner's restraint and confinement of the victim was incidental to and necessary for the completion of his crime of sexual assault. The petitioner in *Nogueira* was convicted of kidnapping and sexual assault following a trial to the court, but claimed in a subsequent habeas proceeding that the kidnapping conviction did not comply with the principles set forth in *Salamon*. Id., 809. This court disagreed because the petitioner dragged the victim approximately 113 feet to a window well, where he sexually assaulted her for two hours. Id., 838. By moving the victim to the window well, the petitioner decreased his risk of detection and increased the risk of harm to the victim because the window well was lined with rocks. Id., 841–42. Moreover, the window well served as a secondary form of restraint and hindered the victim's ability to escape. Id., 842.

In light of the principles of *Salamon* and guided by the cases which have applied those principles, I conclude that the respondent in the present case has met the burden of establishing that the lack of a *Salamon* instruction in the petitioner's underlying criminal trial was harmless beyond a reasonable doubt. On the basis of my review of the record and my cognizance of the dictates of *Salamon*, I conclude that when presented with the facts of the underlying crime, a reasonable jury could not find the petitioner's restraint of the victims in each of the cases against him to have been incidental to and necessary for the commission of the robberies.

I agree with the habeas court's conclusion that the evidence in the record demonstrates that the petitioner's restraint and abduction of the victims were sufficiently distinct from his crimes of robbery to constitute independently significant kidnappings.

The following facts were before the jury when it reached its verdict in the first case. With respect to the earlier of the two robberies, on direct examination, Michael Kozlowski testified that he was working at the Newington Bedding Barn on August 30, 1995, at about 9 p.m. As Kozlowski prepared to close the store, the petitioner entered. Kozlowski testified that he approached the petitioner with the belief that the petitioner was a customer. When Kozlowski showed the petitioner a king-size bed, the petitioner said, "let me count my money," and reached into his bag and produced a gun. Kozlowski testified that the petitioner said, "[d]on't try anything, I'll bust you one, just walk over to the register." The petitioner then told him to get behind the counter and pointed his gun at Kozlowski's chest. Kozlowski testified that, after the petitioner took the money from the cash register and a wallet from his coworker, Howard Silk, "[the petitioner] moved us . . . down to the hallway into the bathroom and . . . he then put us into the bathroom and put a mop handle or something behind the door." Kozlowski testified that the petitioner, as they walked down the hallway to the bathroom, said, "[d]on't try anything; I'll blow your head off . . . ." Kozlowski indicated that after the petitioner closed the bathroom door and locked Kozlowski and Silk in there, "we ducked down thinking he was going to shoot through the door because it was only a piece of plywood, basically, and [a] couple of minutes after, we heard a bell, which is on the front door, [which rings whenever someone enters or leaves the store] . . . we then . . . kicked the door, basically, and went downstairs."

Silk testified that he also was working at the Newington Bedding Barn during the evening of August 30, 1995. Silk stated that, as he was in the process of closing the store, he noticed the petitioner following Kozlowski toward the counter. As the petitioner and Kozlowski approached, Silk realized that the petitioner was pointing a gun at Kozlowski's back. Silk testified that the petitioner told Kozlowski and Silk that he wanted the money, so Kozlowski took the money from the register as the petitioner pointed the gun at Silk's chest. After Silk told the petitioner that there was no safe inside the store, the petitioner led Silk and Kozlowski toward the back of the store at gunpoint. Silk testified that he handed the petitioner the $17 in his wallet and then, the petitioner "proceeded to put us into the bathroom area" and attempted to jam the door with a mop handle. Silk testified that he believed that the petitioner put them in the bathroom so that he could escape and that after less than two minutes, he heard the bell ring that

"goes off when [the door] opens and . . . [he] hoped that [the bell rung] when [the petitioner] left." After waiting for thirty seconds after hearing the doorbell ring, Silk and Kozlowski were easily able to open the bathroom door. Silk testified that they went downstairs into the basement of the building to the warehouse there to call 911 and wait for the police to arrive in the event that the petitioner was still on the first floor.

In the second case, Kelly Wright testified that she was working at the Southington Bedding Barn on September 13, 1995. She recalled that at 8:55 p.m., five minutes before the store was set to close, while Wright's roommate, Idelle Feltman, was waiting in the store to take her home, the petitioner and an unidentified female entered the store. Wright testified that the petitioner and the female split up and appeared to be shopping for king-size beds. Wright testified that she was sitting behind the store counter when the petitioner arrived and that she rose in order to greet him because it was store policy to do so whenever a potential customer arrived. Before Wright could make it around the counter, however, the petitioner told her to get on the floor. Wright testified that she noticed that the petitioner had a gun in his hand and was holding it out parallel to the floor. The petitioner told Feltman to get the money from the register. Feltman gave the petitioner the money in the register in a bank bag. Wright testified that the petitioner then inquired if there was a basement in the store, and Feltman responded by telling the petitioner that there was no basement, but there was a bathroom. Wright testified that the petitioner led her and Feltman to the bathroom at gunpoint and told them to enter the bathroom, lock the door, and "not to be a hero, let the cops do their jobs." Wright stated that she heard a buzzer go off, which indicated that the door to the store had been opened. She and Feltman waited for a "little bit," unlocked the door, and left the bathroom to call 911. Wright estimated that about five to six minutes elapsed between the time the petitioner entered the store to the time she and Wright were able to contact the police.

Feltman testified that she went to the Southington Bedding Barn to pick up Wright from work because the two planned to go out to dinner. During her testimony, she recalled that two people, the petitioner and a woman, entered the store right before closing and that the pair split up after they entered the store. Feltman testified that the petitioner approached the counter and removed a gun from his bag. He waved the gun and told her to give him the money in the register. Feltman emptied the register, which contained less than $100, and handed the money to the petitioner. Feltman testified that after he obtained the money, the petitioner inquired whether there was a basement in the store, and that Feltman and Wright replied that there was no basement, but there was a bathroom. Feltman stated

that the petitioner led her and Wright in a single-file line to the bathroom and then instructed them to enter, while aiming the gun at them and causing them to be scared.[5] Feltman and Wright entered the bathroom and waited a minute or two after they heard the door buzzer that indicated someone had entered or left the store. At this point, the two left the bathroom and found a mattress that had been placed in the narrow hallway leading to the bathroom as a "barricade . . . ." Feltman testified that she pushed it off to the side and "walked right through."

The petitioner argues that the habeas court improperly concluded that the lack of a *Salamon* instruction was harmless beyond a reasonable doubt. On the basis of my review of the record in the present cases, I conclude that the lack of an instruction was harmless because I am persuaded beyond a reasonable doubt that the omission of an instruction on incidental and necessary restraint did not contribute to the verdict. In doing so, I, unlike the majority, set forth an analysis of all of the *Salamon* factors.

With respect to the first factor, the petitioner asserts that the nature and duration of the victims' movement or confinement supports his claim because the confinement lasted only a few minutes and the victims were moved a short distance. Although the respondent must prove that the petitioner restrained and abducted the victims, proof "of kidnapping does not require proof that the victim was confined for any minimum period of time or moved any minimum distance." *State* v. *Salamon*, supra, 287 Conn. 531–32. In order to "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. With respect to the nature of the confinement, the petitioner led the victims to the bathrooms at gunpoint under the threat of deadly force. The explicit threat of death constitutes sufficient control of the victims' liberation to support a kidnapping conviction. See *State* v. *Ayala*, supra, 133 Conn. App. 522–23 (implicit threat against victim's life constitutes sufficient confinement to prevent victim's liberation). Though the short-term duration of the victims' confinement does support the petitioner's claim that he is entitled to a new trial on the kidnapping charge, the petitioner's conduct, viewed in its entirety, evinces that he intended to frighten the victims, prevent their escapes and restrain them beyond what was necessary to commit the robberies. The short period of restraint does not outweigh the fact that the petitioner confined the victims at gunpoint after his prior activities in the stores had met all the elements of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). A jury could not reasonably conclude that the nature and manner of confinement of the victims by forcing them into the

bathrooms with the threat of deadly force after the petitioner obtained the money was merely incidental to and necessary for the commission of the robberies. Rather than finding that the movement and confinement of the victims at gunpoint was incidental to and necessary to complete the robberies, reasonable jurors would undoubtedly find that a kidnapping also occurred because the defendant needlessly moved and confined the victims at gunpoint in order to further advance, or facilitate, his commission of the robberies.

Like the majority, I would conclude that the second factor weighs in the petitioner's favor. The evidence demonstrates that the petitioner's movement and confinement of the victims occurred during the commission of the robbery.[6]

With respect to the third factor, I observe that the petitioner asserts that because the restraint of the victims occurred contemporaneously with the robberies, a reasonable juror could consider that the restraint was merely incidental to the robberies. Restraint, however, is not an element of the crime of robbery; the inquiry is whether the restraint was incidental to and necessary for the commission of the robberies in these particular cases. See *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 436. Restraint that occurs after the underlying crime already has been committed supports the conclusion that the lack of a *Salamon* instruction was harmless error. See *State* v. *Golder*, supra, 127 Conn. App. 190–91. Once the petitioner obtained the money from the registers at gunpoint, his conduct satisfied all the elements of robbery in the first degree. Although the use of force after taking money can be viewed as part of the continuum of conduct that can constitute the crime of robbery; *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986); the relevant inquiry under *Salamon* is not whether the crime of robbery was still ongoing, but whether the use of force "exceed[ed] that which was *necessary* to accomplish or complete" the robbery. (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 547. The petitioner "may be convicted of both kidnapping and another substantive crime if, at any time *prior* to, *during* or *after* the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime." (Emphasis added.) Id. The analysis does not need to pinpoint a precise moment when the crime of robbery ended because the petitioner's threatened use of force in leading the victims to the bathroom can be considered as occurring during the commission of the simultaneous crimes of robbery and kidnapping, and the prolonged use of force was not necessary to complete the robberies. Once the petitioner obtained the money from the register, he could have left the stores. Instead of leaving immediately,

however, the petitioner led the victims to isolated parts of the stores at gunpoint and threatened to use deadly force. Cf. *State* v. *Flores*, 301 Conn. 77, 80–83, 17 A.3d 1025 (2011) (defendant entitled to new trial with *Salamon* instruction when use of force occurred solely in connection with commission of robbery and defendant immediately departed from scene after completing robbery).

Key facts that persuaded our Supreme Court in *Flores* that the lack of a *Salamon* instruction in that case could not be considered harmless beyond a reasonable doubt are absent in the present case. Specifically, in *Flores*, the restraint of the victim occurred at the location the defendant initially found the victim and occurred prior to the taking of any property, while the defendant and his accomplices searched that room for valuables. Additionally, the victim recognized the defendant in *Flores*, which alleviated her fear, and the victim was released immediately after the defendant and his accomplices had taken possession of the valuables. By contrast, the petitioner in the present case moved the victims, and confined them in a more secluded location and ensured that they did not emerge until after he escaped. Additionally, nothing in the present case alleviated the victims' fear. There is evidence that the petitioner's conduct after acquiring the money actually increased the victims' fear. Although, as our Supreme Court recognized in *Flores*, whether the use of force is necessary to complete the underlying crime is generally a question of fact for the jury, the factual dissimilarities in the present case when compared to *Flores* highlight why a reasonable jury would be precluded from finding that the petitioner's conduct did not constitute kidnapping.

As previously stated, I do not view the petitioner's restraint of the victims as incidental to and necessary to commit the robberies. Although the petitioner's threatened use of force in moving or confining a victim can be considered as occurring during the commission of the simultaneous crimes of robbery and kidnapping, his prolonged use of that threat of force cannot reasonably be considered as incidental to and necessary for the completion of the robberies. After the petitioner took possession of the money, his decision to move and confine the victims in a more secluded location can be viewed as an inflection point that shifts how a reasonable jury would view the significance of the petitioner's continuing use of the threat of force. As the evidence in the record reveals, the victims believed that the defendant's initial use of force upon entering the stores was to effectuate his goal of taking possession of the money. Once the petitioner possessed the money, the continued threat of deadly force to move the victims to a secluded part of the stores prolonged their fear and facilitated his escape. Viewing the petitioner's conduct in this light is not an unduly legalistic syllogism because the decisions the petitioner made

increased the harmful and terrorizing impact on the victims.

Turning my attention to the fourth and fifth factors, I observe that the petitioner also argues that the victims were not prevented from summoning assistance and that the restraint did not make it easier for him to escape. The facts, however, reflect that this assertion is incorrect because the restraint of the victims, which was not incidental to and necessary for completion of the robberies, facilitated the petitioner's escape. After the petitioner obtained the money, the victims were led into the bathrooms at gunpoint. The victims were neither able to call 911 as the petitioner led them to the bathrooms, nor were they able to summon assistance from inside the bathrooms. Moreover, out of fear that the petitioner was still in the stores, the victims remained in the bathrooms even after they heard the doorbells. It was not until the petitioner had escaped that the victims were able to call for help. The petitioner also made it more difficult for the victims to seek assistance by propping a broom or mop handle against the door after forcing the victims into bathroom at the Newington Bedding Barn and partially blocking the hallway leading from the bathroom with a mattress as he departed the Southington Bedding Barn. Even if the victims were able to get past these obstacles without great difficulty, the obstacles increased the amount of time that elapsed before the victims were able to summon assistance. For the same reasons that I conclude that the petitioner's actions facilitated his escape and prevented the victims from seeking assistance, I conclude that the petitioner, by placing the victims in the bathroom, decreased his risk of detection. By hindering the victims' ability to call for help, the petitioner was able to get farther away from the crime scenes before emergency responders were aware of the crimes.

Last, with respect to the sixth factor, the petitioner argues that the victims were not placed at risk of harm independent of that posed by the robberies. The facts in these cases reflect that this assertion is incorrect because the victims were subjected to an additional risk of both physical and emotional harm. In order to lead the victims to the bathrooms, the petitioner kept his gun targeted on them for a greater length of time than was necessary to effectuate the crime of robbery. This was inherently dangerous simply because the gun could have discharged due to a malfunction or an accident at any time. Furthermore, it increased the risk of a catastrophe because the victims, fearing for their lives, may have attempted to flee, resist or overcome the petitioner. The petitioner's actions after he obtained the money caused the victims to suffer additional emotional distress. As the evidence in the record reveals, the petitioner's decision to lead the victims down narrow corridors, to secluded parts of the stores, hidden from public view, caused the victims additional fear.[7] The impact

of this additional fear-provoking behavior would not have occurred if the petitioner had just left the stores after he took possession of the money.[8]

Under the facts and circumstances of this case, I conclude that a reasonable jury, provided with the proper, current interpretation of our kidnapping law, could not find that the restraint of the victims was incidental to and necessary to complete the commission of the robberies. The evidence presented by the state, considered as a whole, would prevent a reasonable jury from finding that no kidnappings occurred. Thus, the lack of a *Salamon* instruction in the petitioner's underlying criminal trial was harmless error, and I would affirm the judgment of the habeas court.

[1] At one point, the majority concludes that the jury was free to determine "that the confinement and movement of the [four individuals] after the taking of the money was part of the course of events of the robberies," which is not the standard we are required to apply under *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). I agree completely with Judge Lavine's eloquent dissent in *Bell* v. *Commissioner of Correction*, 184 Conn. App. 150, 174, A.3d (2018) (*Lavine, J.*, dissenting), a case of two robberies that involved stealing money from restaurant safes and the petitioner's ordering the victims into restaurant walk-in refrigerators, closing them inside, and telling them not to leave. Judge Lavine's criticism of the majority's analysis in that case aptly describes the problem I have with the majority's analysis here. The majority expands the definition of the word "necessary" to apply to conduct that was unnecessary to complete the robberies, but simply made their completion easier.

[2] The defendant in *Salamon* also was charged with risk of injury to a child and unlawful restraint in the first degree. Charges of attempted sexual assault in the third degree and three counts of assault in the third degree were withdrawn before trial, but the court concluded that the defendant was entitled to an instruction that he cannot be convicted of kidnapping if the restraint imposed on the victim was merely incidental to an assault, regardless of whether the state tried him for assault because the facts reasonably supported an assault conviction. *State* v. *Salamon*, supra, 287 Conn. 550 n.35.

[3] I note that in light of these facts, our Supreme Court concluded that a reasonable jury could find either that the defendant's restraint of the victim was merely incidental to or necessary for his underlying assault, or that his restraint of the victim constituted a kidnapping. It determined that the facts of the case were a close call and ordered a new trial for the defendant on the kidnapping charge. *State* v. *Salamon*, supra, 287 Conn. 549. If the actions of the defendant in *Salamon* could reasonably have constituted a kidnapping, I do not see how the defendant's actions in the present cases could reasonably constitute anything but kidnappings.

[4] I note that *State* v. *Ward*, supra, 306 Conn. 718, *State* v. *Ayala*, supra, 133 Conn. App. 514, and *State* v. *Lewis*, supra, 148 Conn. App. 511, are direct criminal appeals analyzing whether there was sufficient evidence to support a kidnapping conviction. Reliance on these cases can be problematic in habeas appeals because the petitioner only has to demonstrate that the respondent cannot prove that the absence of a *Salamon* instruction at his underlying criminal trial was harmless beyond a reasonable doubt, a different standard than proving lack of sufficient evidence to convict on direct appeal. See *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 91, 136 A.3d 596 (2016). My reliance on these cases is limited to support the proposition that a reasonable jury, having been instructed in accordance with *Salamon*, properly may find that confinement of a short duration constitutes kidnapping.

In *State* v. *Ward*, supra, 306 Conn. 741, our Supreme Court determined that the trial court improperly granted the defendant's motion for a judgment of acquittal on his kidnapping conviction because the jury, provided with a proper *Salamon* instruction, reasonably could have decided that moving the victim down a hallway and restraining her for ten to fifteen minutes was not incidental to the crime of sexual assault. In *State* v. *Lewis*, supra, 148 Conn. App. 517, the evidence was sufficient to support the defendant's

kidnapping conviction under the rule of *Salamon* when, after committing the crime of assault, the defendant dragged the victim across the ground and tried to force her into a car. The victim resisted until plainclothes police officers arrived, forcing the defendant to let go of the victim. Id., 514. Also, in *State* v. *Ayala*, supra, 133 Conn. App. 522–23, this court found that after the defendant committed the crime of burglary, his actions against the victim amounted to restraint with sufficient independent criminal significance to constitute the crime of kidnapping. The defendant in *Ayala* forced his way into the victim's apartment and once inside "stuck . . . a black handgun into [the victim's] stomach, threatened to kill her and inquired about the whereabouts of his girlfriend. The victim informed the defendant that his girlfriend was not at her residence, at which time the defendant pushed her and demanded that she sit on the couch. The defendant then searched the residence for his girlfriend, and when he was unable to find her, he left . . . ." (Footnote omitted.) Id., 516–17.

[5] Feltman, when describing her emotions as the petitioner led her down the hallway, testified: "I was scared. There was something about [his] eyes. I wanted to make sure that he knew that he was in control. I didn't want to . . . show him that I was fearful or anything like that. I didn't want him to think that I was going to freak out . . . ."

[6] In *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 415, this court stated: "We next address the second relevant *Salamon* factor, that is, whether the movement or confinement occurred during the commission of the separate offense. The respondent argues that the absence of a *Salamon* instruction did not contribute to the kidnapping verdict here because the burglary had been completed prior to the petitioner's conduct comprising the kidnapping. More specifically, he argues that the offense of second degree burglary was complete once there [was] an unlawful entering or remaining in a building with the intent to commit a crime [therein] . . . and the petitioner gestured to his back pocket and told the [complainant] he had a gun. Therefore, he argues, any additional action the petitioner took after he represented by his words or conduct that he possessed a firearm— e.g., ordering the [victim] to sit on the couch, instructing her to move upstairs, touching her elbow in an attempt to get her to move faster—was not necessary to accomplish the already concluded offense of burglary. We do not find this unduly legalistic line of reasoning persuasive.

"The respondent's syllogism fails to recognize that the jury could have viewed the petitioner's actions here as a continuous, uninterrupted course of conduct all relating to the burglary offense. . . . [A]lthough liability for a burglary premised on an unlawful entry attaches upon a defendant crossing the threshold . . . authority exists that a burglary, once begun, continues until all parties participating in the burglary have left the property." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 433–34.

I am troubled by the suggestion in *White* that there cannot be a finding of harmless error so long as the underlying crime is still ongoing and continuing, which contradicts the holding in *Salamon* that a defendant "may be convicted of both kidnapping and another substantive crime if, at any time *prior* to, *during* or *after* the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was *necessary* to accomplish or complete the other crime." (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 547. A proper analysis does not entail pinpointing a precise moment when the crime of robbery ended so as to confine our consideration of whether a kidnapping occurred during conduct that occurred after the robberies.

[7] I disagree with the majority's assessment that the movement and confinement of the victims was "de minimis . . . ." The victims' testimony reflects that the movement and confinement at issue, occurring at gunpoint, gave rise to very real feelings of fear. The victims testified that they waited until they believed the defendant had fled before emerging from the bathrooms for fear they would be shot if they again confronted the defendant.

[8] Potential victims of robberies often are advised, if robbed, to hand over their valuables without resistance so that their risk of harm will not be increased. Imagine, then, the thoughts that rush through the mind of a cooperative victim when the perpetrator does not flee after obtaining the valuables sought, but instead, continues to threaten his victim with a weapon and forces him into a more secluded location. What victim at that point would not anxiously contemplate the possibility that he may possibly be murdered?